Community Development Co. of Gardner *v.* Board of Assessors of Gardner.

*wealth* v. *Cadwell, supra; Commonwealth* v. *Williams,* 364 Mass. 145, 152 [1973]), or of a sudden, violent, and unexpected act by a person other than the defendant (contrast *Commonwealth* v. *Vanderpool, supra* at 750). Rather, death came after the defendant (and others) engaged in a senseless beating of the victim over a considerable period of time. A reduction in the defendant's sentence is not justified.

*Judgment affirmed.*

---

COMMUNITY DEVELOPMENT COMPANY OF GARDNER *vs.* BOARD OF ASSESSORS OF GARDNER.

Suffolk. November 9, 1978. — February 21, 1979.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Taxation,* Urban redevelopment corporation, Federal interest reduction payments, Gross income. *Urban Redevelopment Corporation,* Taxation.

The Appellate Tax Board erred in calculating the estimated gross annual income of a housing project financed and operated under § 236 of the National Housing Act, 12 U. S. C. § 1715z-1 (1976), without taking into account restrictions placed by Federal regulations on the actual income of the project. [354-356]

APPEAL from a decision of the Appellate Tax Board.

*Raymond Kwasnick* for the plaintiff.

ABRAMS, J. At issue is the proper estimated annual income figure to be used in assessing a housing project financed and operated under § 236 of the National Housing Act, 12 U. S. C. § 1715z-1 (1976), as amended. The Community Development Company of Gardner (company), owner of a § 236 project, appealed to the Appellate Tax Board (board) from the refusal of the board of assessors of Gardner (assessors) to abate real estate taxes for

the fiscal years 1976 and 1977. The company claims that in assessing the housing project the assessors[1] used an estimated gross annual income figure which failed adequately to consider Federal restrictions on the income of the project. The board approved the estimated gross annual income figure used by the assessors,[2] and the company appealed. We reverse the decision of the Appellate Tax Board, and remand the case to the board for further proceedings in light of this opinion.

Section 236 provides that the Secretary of the Department of Housing and Urban Development (HUD) may contract to make periodic interest reduction payments on behalf of the owner of a low income housing project. Interest reduction payments are made directly to the mortgagee in an amount sufficient to allow the owner to pay an amount over the life of the mortgage loan as would be required if the loan had been made at an interest rate of one per cent per annum.[3] See *Morville House, Inc.* v. *Commissioner of Corps. & Taxation*, 369 Mass. 928, 931 (1976). The Federal government strictly controls the financial operation of projects financed under § 236.[4]

---

[1] The board of assessors of Gardner did not file a brief or participate in oral argument.

[2] Though the board used the same estimated gross income figure as the assessors, the board arrived at a lower net income figure because it found that the assessors had underestimated the company's expenses. The company disputes the estimated gross income figure used by both, and therefore, of necessity, also disputes both estimated net income figures.

Based on its lower estimated net income figure, the board ordered an abatement of $5,013.59. The assessors did not appeal this determination.

[3] The company had secured a mortgage with an actual interest rate of 7.25%. The interest reduction payment by the Federal government was $169,560 for 1975.

[4] For example, regulations establish a maximum interest rate for such projects. 24 C. F. R. § 236.15 (1978). Moreover, regulations specify how mortgage payments must be applied. 24 C. F. R. § 236.25 (1978). Further, the company's limited partnership agreement contains a clause that all its provisions are subject to applicable Federal regula-

The Federal government controls the rents charged by a § 236 project owner. Federal regulations require the owner to maintain two monthly rental rates for each unit. 24 C. F. R. § 236.55 (1978). The first rate is the "basic monthly rental" rate, established by computing the cost of the project at a mortgage rate of one percent per annum. Tenants pay this basic monthly rental rate or 25% of their income, whichever is greater. The second rate is the "fair market monthly rental" charge. This rate is based on operation of the project at the actual mortgage rate.[5] See note 3, *supra*. Thus the "fair market monthly rental" figure is based on the cost of each unit, not on the amount for which the unit could be rented on the open market.[6]

Any amount collected by the project owner in excess of the "basic monthly" rental rate must be remitted to HUD.[7] 24 C. F. R. § 236.60 (1978). The owner may not charge in excess of the "fair market" rental. 24 C. F. R. § 236.55 (1978).

At the hearing before the board, experts for the company and the assessors both used the "capitalization of income" method of calculating the fair cash value of the housing project. See *Assessors of Weymouth* v. *Tammy Brook Co.*, 368 Mass. 810 (1975). Under this approach the fair cash value of property is determined by applying a "capitalization rate" to the estimated net annual income.

tions, including distribution of "Cash Flow." The agreement provides that in the event of any conflict, the Federal requirements supersede the partnership agreement.

[5] The difference between the sum of the "basic monthly" rentals ($395,220) and the sum of the "fair market" rentals ($564,780) is the amount paid by the Federal government to the mortgagee to reduce the project owner's mortgage costs ($169,560), see note 3, *supra*.

[6] In fact, only two of the two hundred units in the company's project were rented for the "fair market" rental in 1975 and 1976.

[7] The funds paid to HUD may be returned to the project owner pursuant to 12 U. S. C. § 1715z-1(g). However, there is no indication in this record whether such funds were in fact paid or in what amount.

See *Kargman* v. *Jacobs*, 113 R.I. 696, 700 n.5 (1974). There is no dispute in this case concerning the proper capitalization rate,[8] thus the only issue is the proper figure for the estimated net annual income of the housing project.

The board based its estimate of gross annual income from the company's housing project on the sum of the "fair market" rental charges. The board reasoned that the "fair market" rentals "could have been obtained here were it not for the Federal Regulations," therefore those rentals were the best evidence of the earning capacity of the project.[9] The company claims this was error because Federal regulations in fact prohibit it from collecting and retaining the fair market rentals.

In our view the board erred in not taking into account the restrictions placed by Federal regulations on the rent the company could actually receive from the housing project. The board held that the "fair market rentals" represented the project's earning capacity. However, the company could not retain any amount in excess of the basic rental charge. Moreover, the company was forbidden from charging the fair market rental to low income families. Thus, the board based its estimate of gross income on hypothetical rent receipts in excess of those allowed by law. See *Washbridge Hous. Corp.* v. *Tax Comm'n of the City of N.Y.*, 60 Misc. 2d 296, 298 (Sup. Ct. 1968), aff'd 32 App. Div. 2d 899 (N.Y. 1969).

The board, in addition, overlooked the unique status of a federally regulated low income housing project. "The

---

[8] All experts and the board used a capitalization rate of 18.04%.

[9] The gross income figure used by the board was the same as that used by the assessors. However, the assessors reached that figure by treating the interest reduction payments made by the Federal government to the mortgagee as a "subsidy" to the owner of the project. The board correctly rejected the assessors' approach, holding that whether or not the Federal payments were income to the company was irrelevant. See *Morville House, Inc.* v. *Commissioner of Corps. & Taxation*, 369 Mass. 928, 930 (1976). The board stated that it gave no consideration at all to the Federal payments.

377 Mass. 351                                               355

Community Development Co. of Gardner *v.* Board of Assessors of Gardner.

great dilemma in assessing federally assisted housing projects is that the 'value' of these projects is inherently ambiguous. Construction costs are known; but these over-state the market value of a project, since in the absence of subsidy the rental stream produced by the property would not justify the actual expenditure on construc-tion." G. Peterson, A. Solomon, H. Madjid, W. Apgar, Jr., Property Taxes, Housing and the Cities, at 73 (1973). Fur-ther, federally funded projects are particularly vulnera-ble to changes in property taxes. *Id.* 74.[10]

Several jurisdictions have recognized that due to the restrictions on rent receipts, special procedures are appropriate for assessment of low income housing proj-ects. See Mich. Comp. Laws Ann. § 125.1415a (1976); Vt. Stat. Ann. tit. 32, § 3843 (Supp. 1978); Conn. Gen. Stat. §§ 8-215, 8-216 (1979).

Connecticut forbids over-assessment of housing proj-ects which results from failure to consider restrictions on rental receipts. Conn. Gen. Stat. § 8-216(a) (1979). In *Roy-al Gardens Co.* v. *Concord,* 114 N.H. 668, 671-672 (1974), the court held that in assessing a § 236 housing project a master erred in excluding from his consideration as mat-ter of law the Federal restrictions on income from the project.

The board held that this case was controlled by *Dono-van* v. *Haverhill,* 247 Mass. 69 (1923). In that case we upheld the assessment of property without regard to a long-term disadvantageous lease. However, we do not think the restrictions on the company's housing project resemble a disadvantageous lease. Imposition of the Fed-eral restrictions was a condition of financing the project on favorable terms, and without the Federal assistance the project would be impossible.

___

[10] At the board hearing, there was evidence that the company would be forced to default on the mortgage for the housing project if the valuation of the project were based on "fair market rentals."

We think that since the project owner is forbidden by law to retain rents collected in excess of the "basic monthly" rates, the assessors erred in basing their valuation on the higher "fair market" rates.[11] The decision of the board is reversed and the case is remanded to the board for consideration of the company's application for abatement in light of this opinion.

*So ordered.*

---

[11] We note that if Federal restrictions on the income of the project are modified or removed, the project may be reassessed accordingly. See, for example, the recent amendments to 24 C. F. R. §§ 236.55, 236.60 (1978), found in 43 Fed. Reg. 23,567-23,569 (May 31, 1978).