411 A.2d 1326.

## Max R. Kargman *et al. vs.* Stanley D. Jacobs, Tax Assessor, City of East Providence.

FEBRUARY 29, 1980.

Present: Bevilacqua, C.J., Kelleher, Doris, Weisberger and Murray, JJ.

MURRAY, J. The taxpayers Max R. and William M. Kargman filed in the Superior Court pursuant to G.L. 1956 (1970 Reenactment) §44-5-26 petitions for relief from alleged overassessments on their property as of December 31, 1972, December 31, 1973, and December 31, 1974.[1] The petitions for each year were consolidated for a jury-waived trial. A

---

[1]The assessment and levy of local taxes in Rhode Island is governed by G.L. 1956 (1970 Reenactment) chapter 5 of title 44. Under §44-5-1, valuations are assessed on the 31st day of December in each year, and taxes are then apportioned accordingly. The parties stipulated that the taxpayers had satisfied the statutory requirements conditioning the filing of their petitions.

Superior Court justice decided that the assessments exceeded the property's full and fair cash value,[2] and that the taxpayers were therefore entitled to a refund of their overpayments with interest. The Tax Assessor of the City of East Providence (assessor) raises several assignments of error, which we have consolidated to a few material points.

This case presents the identical parties and property involved in our earlier decision of *Kargman v. Jacobs,* 113 R.I. 696, 325 A.2d 543 (1974). The taxpayers as general partners in the Kent Farm Company (company) own in the city of East Providence six parcels of land with buildings and improvements all commonly known as Kent Farm. Kent Farm is a privately owned, federally financed apartment complex, constructed in accordance with the terms of §221(d)(3)[3] of the National Housing Act and regulations thereunder. A regulatory agreement between the company and the Federal Housing Administration (FHA) controls the financial operation of this project and by its terms binds all successors in interest.

At trial, the assessor, who qualified as an expert appraiser, testified that, upon application of the uniform percentage of 80 percent employed in East Providence, he assessed Kent Farm at a valuation of $3,021,420 for each year in issue. Of the total assessed value, he allocated an amount of $139,960 to the land, based on comparable sales. The assessor testified that there were no comparable sales of buildings and improvements, however. He derived the valuation of the buildings and improvements from an appraisal made in 1969 and 1970 by a revaluation firm. That firm had employed the

---

[2]General Laws 1956 (1970 Reenactment) §44-5-12 requires that

"All property liable to taxation shall be assessed at its full and fair cash value, or at a uniform percentage thereof, not to exceed one hundred per cent (100%), to be determined by the assessors in each town or city * * *."

We have construed the term "full and fair cash value" to mean the price that property would bring in a transaction in a fair market between a willing seller and a willing buyer. *CIC-Newport Associates v. Stein,* 121 R.I. 844, 853, 403 A.2d 658, 663 (1979); *Rosen v. Restrepo,* 119 R.I. 398, 400, 380 A.2d 960, 961 (1977).

[3]Housing Act of 1954, §221(d)(3), 12 U.S.C.A. §1715 1(d)(3) (1964), as amended.

"replacement cost, minus depreciation" approach,[4] a recognized method of property valuation, to arrive at its appraisal. Three months prior to trial a fire had destroyed documents containing a breakdown of the revaluation firm's calculations. At trial the assessor admitted that, after the destruction of those documents, previous tax-roll information constituted the only documentary evidence available in support of his assessment.

In contrast, the taxpayers presented testimony of expert appraisers who relied on the "capitalization of income" approach,[5] a recognized method of appraising real property, to arrive at a valuation of Kent Farm. Peter A. Laudati, Jr., testified that a prudent buyer would purchase Kent Farm solely for investment purposes. He stated that a buyer would look primarily to the income stream, especially in light of regulatory restrictions, to gauge a fair purchase price. In view of those factors and in the absence of comparable sales, Mr. Laudati concluded that the capitalization of income approach was the best method for valuating Kent Farm.

Mr. Laudati proposed alternative valuations, under the capitalization of income approach, dependent upon treatment of the assessed property tax in his calculations. In the first instance, he included the then-assessed property tax among expenses deducted from potential gross income. Under that analysis, the complex produced a potential net annual income of $96,400. Mr. Laudati then divided that figure by 12 percent, the rate of return which he believed a purchaser would expect from such an investment. That calculation resulted in a capitalized value of $876,400 with the inclusion of the land's net present value.

---

[4] In his testimony, the assessor defined "replacement cost" as the cost of replacing a structure or improvement with a similar structure or improvement constructed with new materials. Once this figure is determined, estimated accrued depreciation is deducted, while the estimated value of the land is added. The result is the valuation of the property by means of the replacement-cost-minus-depreciation method. *See Kargman* v. *Jacobs,* 113 R.I. 696, 699 n.4, 325 A.2d 543, 545 n.4 (1974); *see generally* 1 Bonbright, *Valuation of Property* 150-176 (1937).

[5] *See Kargman* v. *Jacobs,* 113 R.I. 696, 700 n.5, 325 A.2d 543, 545 n.5 (1974).

In his alternative calculations, Mr. Laudati purported to eliminate distortion in net income reflected in his first set of calculations. According to his testimony, that distortion arose from deducting the alleged tax overassessment from gross income. He therefore did not include the property tax then assessed among the expenses he had deducted previously from potential gross annual income. He instead added 4.4 percent to the 12 percent rate of return he had previously employed. That increment represented the tax ratio in East Providence derived from a rate of $44.40 per $1000 assessed valuation. Upon dividing pretax income of $227,300 by the resultant capitalization rate of 16.4 percent, Mr. Laudati obtained a valuation of $1,386,000. Mr. Laudati asserted that for administrative purposes, the city should carry the property on its tax rolls at a full and fair market value of $1,732,500. Under that procedure, 80 percent of full and fair market value would equal $1,386,000. Mr. Laudati testified that an assessment of $1,386,000 would be substantially accurate for each of the three years in question.

Max R. Kargman, who qualified as an expert appraiser also, supplied additional testimony concerning the appropriateness of using the capitalized-income approach to valuate Kent Farm. Mr. Kargman employed the same general method with a rate of return different from Mr. Laudati's. His calculations resulted in a proposed full and fair cash value of $1,043,000 for Kent Farm for each of the three years in issue.

The taxpayers presented testimony also of Dr. Arthur Solomon, director of the MIT-Harvard Joint Center for Urban Studies and an expert on federally subsidized housing. Doctor Solomon testified that at least five conceptual problems impaired the utility of the replacement-cost-minus-depreciation approach for valuating such property. According to Dr. Solomon, various effects of applicable regulations on income and expenses would go unrecognized if that approach were applied. He concluded that, for purposes of valuating Kent Farm, the replacement-cost-minus-depreciation approach was "far more speculative" than the capitali-

zation-of-income method.

The trial justice accepted the assessor's valuation of the land but rejected the assessed value of the buildings and improvements upon determining that it exceeded their full and fair cash value. According to the trial justice, the "overwhelming weight" of evidence convinced him that a prudent buyer would purchase Kent Farm solely for investment. He, therefore, determined that the income capacity of the property would certainly affect the property's cash value. That finding prompted him to reject the assessor's testimony concerning the property's full and fair cash value, for the assessor had opted to accord no weight to income in arriving at his valuation. The trial justice determined that petitioners' buildings and improvements should have been assessed at $1,440,000, an amount reflecting 80 percent of a full and fair cash value of $1,800,000.[6] Then, adding $1,440,000 to the assessment of $139,960 that he had accepted for the land, the trial justice entered judgment ordering a revised assessment of $1,579,960 for each year in question.

In the litigation leading to our decision in *Kargman* v. *Jacobs*, 113 R.I. 696, 325 A.2d 543 (1974), these taxpayers challenged the legality of assessments assessed on Kent Farm in 1971 and 1972. The posture of that case on appeal to this court was the reverse of that of the present, however. There, the taxpayers appealed from a Superior Court decision that upheld the legality of the assessments for those years.[7] We characterized the issue on appeal as one of burden of proof. After reviewing the record, we determined that the trial justice had acted well within his capacity as factfinder in reject-

[6]The trial justice's determination of the value of the buildings and improvements reflects a figure higher than that calculated by Mr. Laudati. The taxpayers do not question this finding, and we therefore regard his determination as correct in regard to their interests.

[7]The assessment on December 31, 1970, prior to completion of the complex, was $2,535,780. At the close of 1971, by which time the complex had been completed, the property was assessed at $3,021,420, an amount identical to the assessments for the following three years now at issue.

ing the opinion of value offered by the taxpayers' expert. We, consequently, upheld the trial justice's finding that the taxpayers had failed to establish that Kent Farm was assessed at a level higher than its full and fair cash value. *Id.* at 703, 325 A.2d at 547.

I

In support of one of his contentions on this appeal, the assessor directs our attention to a portion of a comment we made in *Kargman v. Jacobs,* 113 R.I. at 705-06, 325 A.2d at 548:

> "The gross apartment rental figure used in its [Kent Farm's] appraisal assumes a 100% rental for all units during the year 1971. However, the East Providence enterprise is limited by governmental order as to the amount of monthly rental it can charge. In seeking to establish fair market value, one looks for the fair rental value rather than the actual income received. In using the income approach, the significant element to be established is the realty's capacity for earning income rather than income actually derived from its operation. *Springfield Marine Bank v. Property Tax Appeal Board,* 44 Ill.2d 428, 256 N.E. 2d 334 (1970). At this point there is no credible evidence that Kent Farm's rental was fair rental income."

Pointing to the testimony of Mr. Laudati and Mr. Kargman, the assessor correctly maintains that both experts computed gross annual income in their capitalization-of-income calculations by adding the maximum allowable rents[8] obtainable from each apartment. The assessor argues

---

[8]The agreement between the company and the FHA provides that the company "shall make dwelling accommodations and services of the project available to occupants at charges not exceeding those established in accordance with a schedule approved in writing by the [Federal Housing] Commission." This restriction is one of several imposed by the Federal Housing Administration as a condition for federal subsidization of §221(d)(3) projects. *See Kargman v. Jacobs,* 113 R.I. 696, 701-02, 325 A.2d 543, 546 (1974). In enacting §221, Congress sought to assist private industry in providing housing for low- and moderate-income families and for displaced families. 12 U.S.C.A. §1715 1(a).

that their calculations yielded lower valuations of the property than would have been derived from incorporating its fair rental value in their calculations. This contention is premised on equating the fair rental value to the earning capacity of Kent Farm in the absence of rental limitations. The assessor claims that *Kargman* v. *Jacobs, supra,* requires incorporation of fair rental value. He thus concludes that the judge erred in admitting Mr. Laudati's and Mr. Kargman's opinions of value.

The language cited by the assessor does indeed imply that a capitalized-income appraisal of Kent Farm, computed on the basis of actual rental income, is inadmissible. We have re-examined our position in light of two decisions published since *Kargman.* We now adopt a stance that rejects that implication. We determine that the rule requiring capitalization of a property's earning capacity is inapplicable to a §221(d)(3) apartment complex with its federal restrictions on rental income.[9]

In *Community Development Company* v. *Board of Assessors,* 377 Mass. 351, 385 N.E.2d 1376 (1979), this same issue confronted the Supreme Judicial Court of Massachusetts. The taxpayers there, owners of a project financed and operated under §236[10] of the National Housing Act, appealed from a refusal of the Appellate Tax Board (board) to consider federal rental income restrictions upon reviewing the assessment of their project. The board had held that the issue was controlled by a case that approved the assessment of property without regard to a disadvantageous long-term

---

[9]We offer no opinion on the applicability of the rule to other circumstances. The rule we applied in *Kargman* v. *Jacobs,* 113 R.I. 696, 325 A.2d 543 (1974), was enunciated in *Springfield Marine Bank* v. *Property Tax Appeal Board,* 44 Ill.2d 428, 256 N.E.2d 334 (1970). In that case the assessed property was under long-term leases commencing some years before and ending some years after the taxable year in issue. At the inception of the leases the rents agreed upon were fair; when the tax was levied, the property could have been rented for an amount substantially in excess of the contractual rent, if the leases outstanding could have been canceled. *Id.* at 429, 256 N.E.2d at 335.

[10]12 U.S.C.A. §1715 z-1 (1976), as amended.

lease. *See Donovan* v. *Haverhill,* 247 Mass. 69, 141 N.E. 564 (1923).[11] It therefore upheld the use of "fair market" rentals by the assessor to compute potential gross annual income used in calculating the capitalized value of the project. The board reasoned that "fair market" rentals "could have been obtained were it not for the Federal Regulations" and were therefore the best evidence of the earning capacity of the project. *Community Development Company* v. *Board of Assessors,* 377 Mass. at 354, 385 N.E.2d at 1378.

The court reversed the board's ruling. It rejected the board's estimate of the project's earning capacity, in part because it was based on "hypothetical rent receipts in excess of those allowed by law." 377 Mass. at 354, 385 N.E.2d at 1378. The court noted that the Legislatures of three states had recognized the appropriateness of special procedures for assessment of low-income housing projects because of governmental restrictions on rent. *See* Conn. Gen. Stat. §§8-215 and 8-216 (1971); Mich. Comp. Laws Ann. §125.1415a (1976); Vt. Stat. Ann. tit. 32, §3843 (Supp. 1978). The decision of *Royal Gardens Company* v. *Concord,* 114 N.H. 668, 328 A.2d 123 (1974), provided precedent for its ruling. There, the New Hampshire Supreme Court held that, in assessing a §236 project, the master should have considered the regulations that required the project owner to charge below-market rents and that limited the rate and amount of investment return. *Id.* at 672, 328 A.2d at 125.

Upon reversing the board's ruling, the Supreme Judicial Court necessarily rejected the board's view that the case of *Donovan* v. *Haverhill, supra,* was controlling. The court grounded that rejection on its perception that the project's rental restrictions did not resemble a disadvantageous lease. "Imposition of the Federal restrictions was a condition of financing the project on favorable terms, and without the Federal assistance the project would be impossible."

---

[11]The operative facts of this case are identical to those in *Springfield Marine Bank* v. *Property Tax Appeal Board,* 44 Ill.2d 428, 256 N.E.2d 334 (1970). See footnote 9, *supra.*

*Community Development Company* v. *Board of Assessors,* 377 Mass. at 355, N.E.2d at 1379.

In *Royal Gardens Company* v. *Concord, supra,* a majority of the New Hampshire Supreme Court ruled also that the federal restrictions were a relevant factor to be weighed in valuating the §236 project. The court determined impliedly that the disadvantageous-lease cases cited by the dissent were inapposite also. Among the lease cases evidently deemed unpersuasive in *Royal Gardens Company* v. *Concord, supra,* was *Springfield Marine Bank* v. *Property Tax Appeal Board,* 44 Ill.2d 428, 256 N.E.2d 334 (1970). We relied on *Springfield Marine Bank* in *Kargman* v. *Jacobs, supra,* to support the language now in issue. In light of the rulings in *Community Development Company* v. *Board of Assessors* and *Royal Gardens Company* v. *Concord,* both *supra,* we are now persuaded that application of the principles of *Springfield Marine Bank* to a §221(d)(3) complex is inappropriate. We therefore rule that federal regulations limiting the rents of a §221(d)(3) apartment complex are a relevant factor in the assessment of its value. *See Somers* v. *City of Meriden,* 119 Conn. 5, 8-9, 174 A.184, 186 (1934); *Kargman* v. *Jacobs,* 113 R.I. at 708, 325 A.2d at 549 (Joslin, J., dissenting). As a result, we hold that the trial justice did not err when he admitted into evidence opinions of value of Kent Farm which incorporated the maximum allowable rents in their supporting calculations.

## II

The assessor raises several other issues meriting limited discussion. In the first, he asserts this court held in *Kargman* v. *Jacobs, supra,* that the assessments then in issue were proper because the assessor had used the "reproduction cost" approach, a recognized method of property valuation. Premised upon that assertion and the claim that he used the same method to obtain the assessments now in issue, he appears to contend that the assessments in issue are insulated from further challenge. We disagree.

There is no support in *Kargman* v. *Jacobs, supra,* for the

assessor's statement of what this court held. Apparently, the following sentence gave rise to his assertion:

> "The trial justice believed that the method employed by Jacobs [the assessor] was 'one of the recognized and accepted ways of ascertaining value,' and that since defendant's method was a proper one, plaintiffs had failed to carry their burden." *Kargman* v. *Jacobs*, 113 R.I. at 701, 325 A.2d at 546.

We need look no further than its words to refute this argument. The sentence declares not what this court held but rather what the trial justice believed.

In his next argument the assessor maintains that the trial justice rejected his testimony for a reason held impermissible in the case of *Pendleton* v. *Briggs*, 37 R.I. 352, 92 A.1024 (1915). The assessor claims that the trial justice rejected his testimony solely because no original records existed that could be introduced into evidence. He points out that the taxpayers introduced into evidence copies of reconstructed appraisal cards, which showed the assessed valuation of the land and buildings. Relying on a quoted passage from *Pendleton*,[12] the assessor appears to contend that the trial justice erred when he rejected that evidence in his decision.

In *Pendleton*, the assessor had introduced evidence other than the original records to refute the taxpayer's claim that

---

[12]In his brief, he quotes the following:

> "The defendant contends that the tax assessors being required by law to assess and apportion the taxes and to post notices of the time and place of their meeting, etc., that the only competent evidence that they had performed those duties must be found in their records and that in the absence or non-existence of such records the plaintiff cannot be allowed to prove by other evidence that the assessors had properly performed the duties required of them by the statute.

> We cannot adopt this view of the defendant. We know of no statute requiring a board of assessors to keep a record of its doings. The original notices for the years 1908 and 1909 having been lost, we see no reason why their authorization and publication cannot be established by the other evidence which the plaintiff offered." *Pendleton* v. *Briggs*, 37 R.I. 352, 357, 92 A. 1024, 1026 (1915).

the assessor had not performed his duties in connection with the assessments in issue. On appeal, the taxpayer contended that only the original records were competent evidence. This court rejected that contention; we saw no reason that warranted exclusion of the other evidence introduced by the assessor to establish performance of his duties. *Id.* at 357, 92 A. at 1026.

In arguing for its application to this case, the assessor misconceives the nature of our ruling in *Pendleton.* That decision concerned the admissibility of, rather than the weight to be accorded to, such evidence. Here, the assessor premises his contention on the admission of evidence other than the original records. His complaint would have merit under *Pendleton* only if the trial justice had excluded such evidence on the ground that it did not consist of the original records.

The assessor next directs our attention to the case of *Greenough* v. *Board of Canvassers and Registration,* 33 R.I. 559, 82 A. 406 (1912). We there ruled that the tax assessors are entitled to a presumption that they have performed their official acts properly until the contrary is proven. *Id.* at 571, 82 A. at 410-11. *See CIC-Newport Associates* v. *Stein,* 121 R.I. 844, 852, 403 A.2d 658, 662 (1979). The assessor claims the trial justice erred by not taking this presumption into consideration. We reject this argument.

Absent proof to the contrary, the presumption imputes legality to assessed valuations. In this case, the taxpayers introduced ample evidence into the record from which the trial justice could determine that Kent Farm was not assessed in accord with 80 percent of its full and fair cash value. Upon proof to the contrary, the trial justice properly disregarded the presumption of legality in *Greenough.*

### III
In support of his remaining contentions, the assessor directs our attention to the trial record. He claims it demonstrates that the trial justice overlooked or misconceived the

evidence on three vital points. In resolving these contentions, we adhere to the rule that this court will not disturb the findings of fact of a Superior Court justice sitting without a jury unless it is shown that he was clearly wrong or that he misconceived or overlooked material evidence on a controlling issue. *CIC-Newport Associates* v. *Stein,* 121 R.I. 844, 852, 403 A.2d 658, 662 (1979); *Fernandes Realty Corp.* v. *Lagace,* 121 R.I. 513, 516, 401 A.2d 43, 45 (1979).

The assessor seizes first on a misstatement that the trial justice made in his recapitulation of Mr. Laudati's testimony while reviewing the evidence:

> "and after discussing in detail the various factors he [Laudati] considered, and after using a capitalization rate of 8%, he found the full and fair cash value of the subject property to be $1,732,500."

The record discloses that Mr. Laudati, in fact, employed capitalization rates of 12 percent and 16.4 percent in his alternative calculations of the value of Kent Farm.

We conclude that the trial justice did not misconceive or overlook a material fact on a controlling issue when he misstated the rate. This misstatement occurred in that portion of the trial justice's decision that merely reviewed the evidence at trial. The assessor introduced no evidence to contest the rates of capitalization used by Mr. Laudati. Those rates, as such, were not in issue and were therefore not controlling on the opinions of value derived from them. The trial justice, accordingly, made no finding about the proper rate of capitalization. The misstatement in no way impinged upon the trial justice's findings of the full and fair cash value of Kent Farm in light of the evidence on the record.

The assessor points next to that portion of the trial justice's decision where Mr. Laudati's testimony concerning the property's full and fair cash value is recapitulated. There, the trial justice summarized Mr. Laudati's testimony as having assigned a full and fair cash value of $1,732,500 to Kent Farm, with a resulting 80 percent assessed value of

$1,386,000. The assessor claims, and the record supports his conclusion, that Mr. Laudati upon capitalizing income of $227,300 at a rate of 16.4 percent determined that the full and fair cash value of Kent Farm was $1,386,000. Mr. Laudati then added 25 percent of $1,386,000 so that the city would "administratively" carry the property at a full and fair cash value of $1,732,500, while assessing it at $1,386,000 or 80 percent of $1,732,500. The assessor claims that Mr. Laudati should have taken 80 percent of $1,386,000.

The trial justice's findings of fact, in contrast to his restatement of the testimony, are the appropriate foci for this court's review. Misstatements of the abstracted evidence are relevant only insofar as they are reflected in findings of fact that are unsupported by the record. Such findings must relate to material facts on a controlling issue to constitute reversible error. *CIC-Newport Associates* v. *Stein,* and *Fernandes Realty Corp.* v. *Lagace,* both *supra.*

Although there is a strand of conceptual merit to the assessor's argument, we determine that the trial justice's findings are supported by Mr. Laudati's testimony at trial. His presentation may have been conceptually inadequate, but the proper time to discredit it was at trial.[13] The trial justice,

---

[13]In *Fernandes Realty Corp.* v. *Lagace,* 121 R.I. 513, 515, 401 A.2d 43, 46 (1979), we noted that capitalized valuations based in part upon the very taxation under challenge are likely to result in a distorted valuation. This problem is eliminated when pretax income is capitalized with an appropriate percentage adjustment in the capitalization rate. Mr. Laudati attempted to avoid this problem, but his approach incurred a new conceptual shortcoming because the city assessed property at a uniform 80 percent of full and fair cash value. Although unnecessary to resolution of the issue before us, we shall endeavor to correct his mistake for the benefit of future appraisals.

Capitalization of income, if the proper rates are employed, yields an estimate of a property's full and fair cash value. Nevertheless, upon calculating what he believed was Kent Farm's full and fair cash value of $1,386,000, Mr. Laudati asserted that the property should be carried on the city's tax rolls at a full and fair cash value of $1,732,500. This assertion was made in recognition of the 80 percent uniform percentage of assessment employed in East Providence. On appeal defendant claims that the assessment should have been at 80 percent of the full and fair cash value. While the assessor's position is correct in theory, the problem is that when a city assesses taxes at a uniform percentage, that factor must not be allowed to distort the capitalization rate.

therefore, committed no reversible error when he accepted Mr. Laudati's uncontradicted testimony on this issue. Moreover, the assessor's claim of error, if allowed, would result in further diminution of Kent Farm's assessed value. Our decision to deny this claim results, therefore, in no prejudice to the party advancing it.

Finally, the assessor contends that the trial justice, in rejecting the city's assessment, overlooked or misconceived material evidence presented by the assessor. He directs our attention to a statement made by the trial justice in his decision: "the sole expert opinion relied on by the city was unsupported in the evidence by any factual data or factual basis * * *." The assessor maintains that this passage shows that the trial justice overlooked or misconceived his testimony. The assessor further claims that the only reason offered by the trial justice for rejecting his testimony was that the original records had been destroyed and that the trial justice had

Mr. Laudati failed to prevent such distortion; his assertion that the property should be carried on the tax rolls at $1,732,500 merely compounded his original error. When capitalizing Kent Farm's pretax earnings of $227,300, Mr. Laudati added 4.4 percent to the 12 percent rate of return which he had used previously to capitalize net income. He derived the figure of 4.4 percent from a property tax rate of $44.40 per $1000 assessed valuation. The problem is that such a rate applies to 80 percent of full and fair cash value. He should therefore have used the percentage that would return $44.40 on $1250 full and fair cash value of which $1000 is 80 percent. Had he done so, he would have obtained a figure of 3.552 percent reflecting a tax of $35.52 on each $1000 of full and fair cash value.

If he had added 3.552 percent to 12 percent he would have obtained 15.552 percent. He should have divided pretax income of $227,300 by 15.552 percent instead of the 16.4 percent figure he used. He would then have obtained a full and fair cash value of $1,461,548 for Kent Farm. Applying 80 percent to that full and fair cash value, he would have obtained an assessed value of $1,169,238. Upon applying a rate of 4.4 percent to $1,169,238 -- reflecting a tax rate of $44.40 per $1000 assessed valuation --he would have obtained a tax of $51,914. Applying the 12 percent rate of return to the full and fair cash value of $1,461,548, he would have obtained a return of $175,386. Verifying the accuracy of these figures is the fact that the sum of $51,914 and $175,386 is $227,300, the actual pretax income of Kent Farms.

Calculated in this manner, the amount of tax is derived from 80 percent of the full and fair cash value and reflects the uniform percentage employed in East Providence. The return is calculated directly from the full and fair cash value, rather than from the value employed for purposes of assessment.

therefore held that he could not properly weigh the assessor's opinion of value. In essence, the assessor contends that the trial justice overlooked or misconceived material evidence on a controlling issue when he rejected his opinion of value while accepting Mr. Laudati's opinion.

In such cases, we have ruled that a trier of fact can accept the property valuation of one set of experts and reject that of another set of experts, particularly when he gives good reasons for so doing. *Kargman* v. *Jacobs*, 113 R.I. at 702, 325 A.2d at 546; *Socony-Vacuum Oil Co.* v. *French*, 88 R.I. 6, 11-12, 143 A.2d 318, 321 (1958). The record before us supports the trial justice's finding that Kent Farm was overassessed. He did not overlook or misconceive the assessor's testimony; rather, he rejected it for good reasons.

The assessor introduced no statistical breakdown in support of his opinion of value obtained by employment of the replacement-cost-minus-depreciation approach. Earlier, however, he testified that replacement cost was the cost of replacing a structure or an improvement with a similar structure or improvement constructed with new materials. Yet, he adduced no statistical evidence to support his determination of the replacement cost. The trial justice found the reconstructed appraisal cards unavailing not because they were reconstructed, but because they contained no evidence showing how the replacement-cost figure was derived. The cards merely restated the assessed valuations for each parcel, figures to which the parties had stipulated previously.

The problem with the assessor's testimony was that it was predicated on the statistical validity of the replacement-cost figures. The trial justice did not overlook or misconceive the assessor's testimony; he found it unpersuasive in the absence of evidence supporting the accuracy of the figures upon which his testimony was predicated. In this sense, there were no factual data or factual bases for his testimony, as the trial justice stated in his decision. Without statistical support, the assessor's testimony was of little more probative weight than testimony of the taxpayer's expert that the trial justice re-

jected in *Kargman* v. *Jacobs, supra. See also Nasco, Inc.* v. *Director of Public Works,* 116 R.I. 712, 721, 360 A.2d 871, 876 (1976). Furthermore, the assessor did not calculate the elements of physical and economic depreciation and thus created an obvious gap in his method of valuation.

The assessor argues, however, that the assessments challenged in this case were identical to the 1971 assessment "baptized" by this court in *Kargman* v. *Jacobs, supra.* He claims that this factor constitutes a proper foundation for the trial justice's acceptance of his testimony in this case. This argument misconceives the nature of our ruling in *Kargman* v. *Jacobs, supra.* There we held that the trial justice did not err when he found the taxpayers had failed to establish that the assessment exceeded Kent Farm's full and fair cash value. That holding did not necessarily establish that the assessor had assessed Kent Farm at its full and fair cash value. Rather, we ruled that the taxpayers had not overcome, as a matter of law, the presumption that the tax assessor had performed his official acts properly. *See CIC-Newport Associates* v. *Stein* and *Greenough* v. *Board of Canvassers and Registration,* both *supra.*

Our review of the evidence in this case indicates that the trial justice did not err in finding that the taxpayers had met their burden. The assessor did not introduce any opinions of value based on the capitalization-of-income approach. Mr. Laudati, on the other hand, presented a thorough basis for his opinion of value derived from the capitalization of Kent Farm's pretax income. *See Fernandes Realty Corp.* v. *Lagace,* 121 R.I. 513, 515, 401 A.2d 43, 46 (1979). These factors combined with the undisputed evidence that a buyer would purchase Kent Farm solely for investment lead us to conclude that the trial justice could properly determine that Mr. Laudati's opinion of value was more persuasive than the assessor's. Mr. Laudati relied on the capitalization-of-income approach, which the assessor declined to employ. For these reasons, we determine that the trial justice neither overlooked nor misconceived material evidence adduced by the assessor on a controlling issue.

Having determined that the assessor's contentions are without merit, we deny and dismiss his appeal.

*F. Thomas O'Halloran, Marcus E. Cohn, David Saliba,* for plaintiffs.

*Joseph T. Little,* for defendant.