BURRILLVILLE RACING
ASSOCIATION

v.

Leo H. TELLIER, Tax Assessor for the
Town of Lincoln.

No. 88–118–A.

Supreme Court of Rhode Island.

May 9, 1990.

Mark L. Smith, Lynn A. Bouvier, Sutherland, DiGianfilippo & Smith, Woonsocket, for plaintiff.

Joseph T. Little, East Providence, for defendant.

## OPINION

SHEA, Justice.

This matter is before the Supreme Court on appeal by the town of Lincoln (town or defendant) from a judgment entered in the Superior Court in favor of the Burrillville Racing Association (taxpayer or plaintiff). The taxpayer had challenged the town's revaluation of its property on which it operated a greyhound racetrack. It alleged that the new assessment was in excess of the fair market value of its property. We reverse.

Preliminarily we would note that the trial justice had granted the taxpayer's prayer for relief not only for the taxes assessed December 31, 1981, the year of the revaluation, but also for the four subsequent years. He did so after allowing the taxpayer, over the town's objection, to file an amended complaint. The original complaint sought relief from taxes assessed as of December 31, 1981, and the amended complaint sought relief for the four succeeding years.

When the town appealed from the judgment for the taxpayer, this court ordered the taxpayer to appear and show cause why judgment should not be entered for the town in regard to the four subsequent years added to the lawsuit by the amended complaint. Following a show-cause hearing, the town's appeal concerning taxes assessed as of December 31 in the years 1982, 1983, 1984, and 1985 was sustained, and we directed that judgment for defendant must be entered for those years.

Consistent with our recent holding in *Northgate Associates v. Shorey,* 541 A.2d 1192 (R.I.1988), we determined that the trial court was in error in granting relief for the four subsequent years. The issues in *Northgate* were virtually identical to those in the case before us. In that case we acknowledged this court's holding in *Tripp v. Merchants' Mutual Fire Insurance Co.,* 12 R.I. 435, 436 (1879), which held that the exclusive remedy for anyone aggrieved by a municipal assessment is provided in the taxing statute. Similarly, in *Northgate* itself we recognized that the specific language of G.L.1956 (1980 Reenactment) § 44–5–27 [1] states that the remedy provid-

---

1. General Laws 1956 (1980 Reenactment)       § 44–5–27 provides:

ed by § 44–5–26 shall be the exclusive remedy. That latter section provides for the filing of an appeal with the local tax assessor within three months after the last day appointed for the payment of the tax without penalty. Within thirty days of the denial of that appeal to the local assessor, the taxpayer must file a petition in the Superior Court in the form set out in that section. Consequently the amendment to include a prayer for relief for the years 1982, 1983, 1984, and 1985 should not have been allowed.

The parties were in agreement on the reproduction (or replacement) costs of the physical improvements on the property in question. Those costs were as follows:

| | | |
|---|---|---|
| Grandstand | | $10,396,630 |
| Clubhouse | | 4,630,760 |
| Pavement and Asphalt | | 784,080 |

| Auxiliary Building | Size in Square Feet | Value per Square Foot |
|---|---|---|
| 1 | 480 | $8.50 |
| 2 | 1385 | 7.50 |
| 3 | 3860 | 8.00 |
| 4 | 8064 | 8.00 |
| 5 | 12,000 | 8.00 |
| 6 | 16,920 | 8.00 |
| 7 | 3,360 | 8.00 |
| 8 | 1,265 | 7.50 |
| 9 | 3,080 | 7.50 |
| 10 | 4,000 | 8.00 |

The experts for both parties used the replacement-cost-less-depreciation method for making an evaluation for assessment purposes. That is one recognized method for determining value in real estate appraisals. We have stated that reproduction costs must be adequately discounted for obsolescence and inadequacy as well as for physical deterioration. *Travellers Building Association, Inc. v. Providence Redevelopment Agency*, 106 R.I. 83, 89, 256 A.2d 5, 9 (1969). Both experts also agreed that there were no comparable sales that they could consider to determine the fair-market value of the buildings on the racetrack property. They agreed that the nature of the business conducted on the land, pari-mutuel betting on greyhound races, precluded the use of the capitalization-of-income method for evaluation. Comparable sales of similarly zoned land were considered by the experts in determining the value of the land itself.

The taxpayer's expert testified to the following evaluations and computations regarding the taxes assessed as of December 31, 1981: [2]

*Grandstand:* Replacement Cost—$10,396,630, less 28 percent physical deterioration, less 73 percent functional obsolescence, leaving a value for assessment purposes of $2,021,110.

*Clubhouse:* Replacement Cost—$4,630,760, less 40 percent physical depreciation, less 73 percent functional obsolescence, leaving a value for assessment purposes of $750,183.

*Pavement and Asphalt:* Replacement Cost—$784,000, less 45 percent physical deterioration, less 73 percent functional obso-

"Exclusiveness of remedy by petition.—The remedy provided in § 44–5–26 shall be exclusive if the taxpayer owned or possessed any ratable estate at all, except that in a proper case the taxpayer may invoke the equity jurisdiction of the superior court provided that complaint if filed within three (3) months after the last day appointed for the payment without penalty of such tax, or the first installment thereof, if such tax be payable in installments. A taxpayer alleging an illegal or void tax assessment against him shall be confined to the remedies provided by § 44–5–26."

2. It is apparent from the record that the figures elicited from plaintiff's expert varied during the course of trial and as such cannot be definitively reconciled.

lescence, leaving a value for assessment purposes of $116,435.

*Auxiliary Buildings:* Replacement Cost—$7.50 to $8 per square foot, less 40 percent to 55 percent physical depreciation, less an additional 73 percent functional obsolescence, resulting in a value for assessment purposes of $58,477.

*Primary Site Land:* 60 acres at $15,000 per acre = $900,000.

*Residual Land:* 127 acres at $1000 per acre = $127,000.

In arriving at a value for the primary-site acreage, the taxpayer's expert made reference to the sale of the comparable property from the former Narragansett Race Track. On cross-examination he acknowledged that the sale of the Narragansett Race Track to the city of Pawtucket had actually worked out to a figure of more than $30,000 an acre, not the $15,000 figure that he assigned to the land in question. He said he had adjusted the figure down 50 percent, relying upon his experience, but he gave no specific details about the adjustment process he used.

In this case the taxpayer's expert did not measure the property in question. He said he had used one of several plat plans obtained from the town tax assessor's office that were made available. He did not know which of the several available plans he had used, and it is clear that the plan he said he had used was not in evidence. He did not have the plat plans with him when he testified and did not know where they were. Although he testified that only sixty acres of the entire parcel of land was necessary for the greyhound-racing operation, he never indicated where within the entire tract this primary site of sixty acres was located. He referred to those sixty acres as "hypothetical."

The taxpayer's expert used such phrases as "my experience," "my knowledge," "industry standards and guidelines used by people in the development industry," "pure estimate," "I felt it was an amount sufficient," "merely observation," and "just looking at this and saying that looks like about a thousand feet."

During his testimony this expert witness acknowledged not only that much information he had considered in reaching his conclusions was obtained from sources not in evidence but also that many of his conclusions were based on his "experience" rather than on facts to which he testified. The law is clear, however, that when an expert testifies, he must specifically set forth the factual basis to support his conclusion. If he does not, the court must disregard his testimony. We have stated that "[a]n expert may not give an opinion without describing the foundation on which his opinion rests." *Nasco, Inc. v. Director of Public Works,* 116 R.I. 712, 721, 360 A.2d 871, 876 (1976).

The tax assessor of the town also testified about his computations upon which the December 31, 1981 revaluation was based. This testimony is summarized as follows:

*Grandstand:* Replacement Cost—$10,396,630, less 28 percent physical depreciation, less 10 percent functional obsolescence, leaving a value for assessment purposes of $6,737,020. It was the assessor's opinion that the grandstand was operating at close to 90 percent of its functional capacity.

*Clubhouse:* Replacement Cost—$4,630,760, less 40 percent physical depreciation, less 50 percent functional obsolescence, leaving a value for assessment purposes of $1,389,230.

*Pavement and Asphalt:* Replacement Cost—$784,080, less physical depreciation of 45 percent; *no* functional obsolescence—it had a remaining useful life of 55 percent. Value for assessment purposes was $431,240.

*Auxiliary Buildings:* Replacement Cost—$431,040, less between 45 to 55 percent physical depreciation, less functional obsolescence varying from 10 percent to 50 percent in different buildings, depending on the actual extent to which these buildings were being used—leaving a value for assessment purposes of $178,680.

*Primary Site:* 80 acres, used for the racing activities, outer buildings, and parking at $32,500 per acre based on sales in

Lincoln of comparable commercial and industrial land = $2,600,000.

*Residual Site:* 81.8 acres, zoned residential, at $1,000 per acre = $81,800.

■■■ The assessor defined "functional obsolescence" as a lack of utility or desirability of part or all of a property inherent in the improvement. It applies only to the buildings, never to the land. Similarly, the town's other expert, a real estate appraiser, testified that "[l]and is not a depreciating asset." We agree.

The major issue on appeal involves the application of functional obsolescence by the experts and the effect of functional obsolescence on the fair-market value of the premises in question. In *Travellers Building Association, Inc. v. Providence Redevelopment Agency*, 106 R.I. at 90, 256 A.2d at 9, this court stated:

"While we have never attempted to make an all-inclusive definition of functional obsolescence, we believe that it includes a loss of value which is inherent in a building because of its inability to perform adequately its intended function. It is usually represented by antiquated design, appearance, overdesign and other structural features outdated when compared with modern design and construction. U.S. Army Corps of Engineers (October 1955 ed.), *Real Property Appraiser's Handbook*, at 24. Functional obsolescence may also be described as a loss in value resulting from inadequacies in a structure either in its inception or as the result of technological improvements which develop in the course of time. 5 Nichols, *Eminent Domain*, § 20.3 (3d ed.1962) at 390–391."

■■■ At trial the taxpayer presented five employees who testified about the substantial decrease in the attendance at the taxpayer's pari-mutuel betting facility from 1949, when the racetrack was used for racing thoroughbred horses, to the present period in which the facility has been used for greyhound racing. The taxpayer's expert defined "functional obsolescence" as a "lack of utility within the subject property that can take many forms." He then stated that the maximum physical capacity of

the property when it was used as a horse-race track was 30,000 people. The maximum attendance since the track was converted to greyhound racing has been 8,000. It was his opinion that the highest and best use of the land was as a horse-racing track. The second highest and best use was for another form of racing, such as dog racing. He then observed that the 30,000–maximum–attendance figure at the horse-racing events constituted 100 percent of the facility's functional utility. The average 8,000 attendance at dog racing represented, in his opinion, a 27 percent use of the property's physical capacity. From these figures he reasoned that the functional obsolescence of the property in its present use was 73 percent. The expert then applied the 73 percent functional obsolescence to the entire parcel, buildings and land as well.

The taxpayer's expert was in error, in our opinion, in computing the functional obsolescence at a blanket 73 percent when he presented his figures of maximum attendance for horse racing as compared with greyhound racing. There was other evidence in the record that the race-track facility was actually being used more frequently and intensely as a dog track despite the fact that daily attendance had decreased. Because dog races require less time and less elaborate preparation, more races could be run in a day. The number of performances in 1977 was 107, whereas the number in 1985 had increased to 462. Also, the fact that the track operators were making a more efficient use of the premises is established by evidence that the pari-mutuel handle, which was $24,285,672 in 1977, had increased almost every year up until 1985, when it was $129,131,351. There was also evidence that the per-capita handle had increased from an average of $68.94 per person attending to $118.59 per person. The taxpayer's opinion concerning functional obsolescence, which was based solely upon the gross attendance figures, is not valid. It ignores the fact that the evidence indicated that whereas fewer people attended the dog races, they apparently spent more and the racetrack operation

was making more money. The taxpayer's expert admitted that he had not considered all those figures in spite of the fact that a willing buyer of the facility would certainly be interested in the amount of revenue and profit the business generated.

Moreover, the reliance of the taxpayer's expert on the decline in attendance at the park when determining functional obsolescence is erroneous. The issue of attendance relates to the management of the facility and cannot be factored in when calculating functional obsolescence. *See Kargman v. Jacobs*, 113 R.I. 696, 706, 325 A.2d 543, 548 (1974) ("the valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners," quoting *City of New Brunswick v. State of New Jersey Division of Tax Appeals*, 39 N.J. 537, 189 A.2d 702 (1963)). Evidence of functional depreciation, to be admissible, must demonstrate that the property, even though out of date, was not functioning efficiently for the purpose to which it was put. *Trustees of Grace and Hope Mission of Baltimore City, Inc. v. Providence Redevelopment Agency*, 100 R.I. 537, 543–44, 217 A.2d 476, 479–80 (1966). The opinions of the taxpayer's expert in this regard were not supported by reason or the evidence.

Many years ago, in *Greenough v. Board of Canvassers*, 33 R.I. 559, 571, 82 A. 406, 411 (1912), this court stated that "[t]he assessors of taxes are sworn officers of the law, and are entitled to the presumption that their official acts have been properly performed, until the contrary is proved." More recently we held that "absent proof to the contrary, it is presumed that tax assessors perform their official duties properly, and this presumption imports legality to the assessed valuations." *Lowry v. Faraone*, 500 A.2d 950, 952 (R.I.1985) (citing *Kargman v. Jacobs*, 122 R.I. 720, 731, 411 A.2d 1326, 1332 (1980)).

The burden of proof in this case was on the taxpayer to prove his contention that the tax assessor of the town of Lincoln had set a value on its property that is greater than its full and fair cash value. It is our opinion that the taxpayer has failed to do so.

For these reasons the defendant's appeal is sustained, the judgment appealed from is reversed, and the papers of the case are remanded to the Superior Court with directions that judgment be entered for the defendant.