**Supreme Court**

No.  2014-157-Appeal.
(WC 11-252)
No. 2014-158-Appeal.
(WC 12-105)
No. 2014-160-Appeal.
(WC 13-152)

Laurence F. Whittemore, III et al.　　　　:

v.　　　　　　　:

David B. Thompson, in his capacity as Tax　:
　Assessor for the Town of Westerly.

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2014-157-Appeal.
(WC 11-252)
No. 2014-158-Appeal.
(WC 12-105)
No. 2014-160-Appeal.
(WC 13-152)

Laurence F. Whittemore, III et al.                    :

                              v.                                   :

David B. Thompson, in his capacity as Tax    :
    Assessor for the Town of Westerly. [1]


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**   This case is before the Court on appeal by the defendant, David B. Thompson, tax assessor for the Town of Westerly, from a judgment of the Superior Court in favor of the plaintiffs, Laurence F. Whittemore, III and Kathleen M. Whittemore.  The trial justice granted the plaintiffs' three petitions for relief from property tax assessments on their home at 5 Manatuck Avenue (the subject property) for the years 2009, 2010, and 2011.  The petitions were consolidated for a nonjury trial and the appeals have also been consolidated.  The defendant asserts that the trial justice erred: (1) in failing to dismiss the Whittemores' petitions after finding that the Whittemores did not prove the fair market value of

---

[1] The original defendant in these cases was Charles E. Vacca, in his capacity as tax assessor for the Town of Westerly.  Mr. Thompson is the new tax assessor and was substituted as the party defendant after these appeals were filed.  See Rule 25 of the Superior Court Rules of Civil Procedure.

- 1 -

their property; (2) when she rejected the opinions of both parties' experts, but instead devised her own method for determining the fair market value of the property; (3) when she rejected the 2008 appraisals of the property based on a flawed generalization; and (4) in failing to dismiss the third petition challenging the town's 2011 assessment because she erroneously found that the town's appeals forms did not include mandated statutory language. For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court.

**1**

**Facts and Travel**

**"[I]n this world nothing can be said to be certain, except death and taxes."[2]**

The Whittemores moved quickly when they heard that the property at 5 Manatuck Avenue was going to be listed for sale. Each had spent significant amounts of time in Westerly, both growing up and as adults, bringing their children to Mr. Whittemore's parents' home in the Weekapaug section of town during the summers. In the summer of 2006, at a time when the Whittemores' children were young teenagers, the couple began looking for a property to purchase in the Watch Hill section of Westerly because their children had enjoyed past summers with their friends there. They viewed at least fifteen properties between 2006 and 2008, hoping to find a property that would not require renovation, because they believed they had only a few summers remaining before their children went to college. The Whittemores made offers on two properties, one for $3 million and one for $5 million, but both were rejected by the sellers.

---

[2] Benjamin Franklin, <u>Letter to Jean-Baptiste Leroy</u>, <u>in</u> Bartlett's Familiar Quotations 303 (Geoffrey O'Brien, ed., 18th ed. 2012).

When their broker alerted them that the property at 5 Manatuck Avenue was going to be listed later in June, the Whittemores jumped at the opportunity to preempt any competition. The house on the property, which was built in 2002, was newer and larger than the other homes they had seen, but it nonetheless fit with the character of the neighborhood. The lot, which was about 100 yards from the beach, was slightly over an acre in size and the two-story house had six bedrooms, six bathrooms, and ocean views from the second floor. The $7.85 million asking price was much higher than the Whittemores had anticipated paying, but they made an offer of $7.1 million because the property was superior to other properties and fit their needs. Mr. Whittemore believed they were offering an amount in excess of the fair market value, but he felt that it was worth the extra expense because, at that time, housing prices had been increasing for many years, and he planned to keep the property in the family.[3] The sellers accepted the Whittemores' offer and they entered into a purchase and sale agreement for the property in June 2008.

By the fall of 2008, the financial climate had changed radically. The Whittemores initially had planned to finance most of the sale price by liquidating some investment accounts; however, in September 2008, the liquid assets available to the Whittemores, like so many others, had dropped dramatically. As a result, to finance the sale by the agreed closing date, the Whittemores came to a financing arrangement with the sellers, whereby $4 million was financed by the sellers and they paid the remaining $3 million. Shortly thereafter, however, the Whittemores paid off the personal loan obtained from the sellers by securing a loan from

---

[3] Furthermore, the Whittemores believed that it was worthwhile to offer a price that they believed would prevent the sellers from offering the house to a larger group of buyers because the house had yet to be listed on the Multi-State Listing Service.

Washington Trust Company. To approve the loan, Washington Trust obtained two appraisals, valuing the property at $6.9 million and $6.5 million.

In 2009, the Town of Westerly Tax Assessor, Charles Vacca, conducted a statutorily mandated townwide revaluation;[4] he reassessed the Whittemores' property at $5,976,600 on December 31, 2009 (the effective date), an assessment substantially higher than the assessed value of $5,260,900 that the property had when it was purchased by the Whittemores. The Whittemores objected to that assessment and, after an informal meeting with the tax assessor in the spring of 2010, the town agreed to lower the assessment slightly to $5,905,000.

The Whittemores, still dissatisfied with the assessment, hired Stephen McAndrew, a licensed real estate appraiser who had experience in tax appeals. McAndrew filed an "Annual Return" with the tax assessor on behalf of the Whittemores on October 26, 2010, and he filed a formal appeal with the tax assessor the following day. After Vacca denied the appeal, the Whittemores appealed his decision to the board of assessment review. The Whittemores also appealed the 2010 and 2011 assessments, which remained the same amount as the 2009 assessment. Each year, plaintiffs filed an "Annual Return," but after the March 15 yearly deadline, set forth in G.L. 1956 § 44-5-15. The board denied each appeal, and the Whittemores filed separate petitions in the Superior Court to reduce the tax assessment for each of the three years at issue.

---

[4] General Laws 1956 § 44-5-11.6(a) required that "beginning on December 31, 2000, the assessors in the several towns and cities shall conduct an update as defined in this section or shall assess all valuations and apportion the levy of all taxes legally ordered under the rules and regulations * * *; provided, that the update or valuation is performed in accordance with the following schedules: * * *." Westerly was scheduled to conduct an "Update" of the assessments in 2003 and 2006 and a "Revaluation" in 2009. Id. at § 44-5-11.6(a)(2)(i). More detailed explanations of assessment updates and revaluations are related by the expert testimony, infra.

In April 2013, a three-day trial began in the Superior Court on the three consolidated tax-appeal petitions. The trial justice acknowledged that the petition for appeal from the 2011 tax assessment had been so recently filed that the town had not had the opportunity to answer the petition; as a result, the parties agreed to address the issue of the town's affirmative defense—that the Whittemores had failed to timely file an "Annual Return"—in posttrial briefing. In the prosecution of their case, plaintiffs offered three witnesses: Mr. Whittemore, McAndrew, and Vacca. The defendant called Vacca, Stephen Ferreira, the District Manager of Vision Government Solutions, a company specializing in mass appraisals, and David Thompson, the new town tax assessor.

### Stephen McAndrew's Testimony

McAndrew testified that he conducted a retrospective appraisal of the property around the end of 2010, to determine its value as of December 31, 2009. In his appraisal, he described the Watch Hill neighborhood as characterized by mini-estates, with many properties being over an acre "with supporting improvements best-termed mansions." McAndrew described the prevailing market conditions as, "[t]he subject neighborhood is reflecting both stabilization and declining values. * * * Values exceeding [$1,500,000] are felt to continue to decline. Viewing into the foreseeable future, decline in the area is estimated on an annual basis to be 6%." At trial, McAndrew said that hindsight clarified market trends, but that his conclusion was ultimately the same as in 2010, explaining that values reached a peak in 2005, remained stable until the beginning of 2008, and then showed an "absolutely definable loss in value in the marketplace," which McAndrew projected to be on an annual basis of about 6 percent, until around 2012, when values began to stabilize. He also testified that, in Watch Hill, the lower-value properties stabilized earlier, but the upper-level property values had not yet done so.

McAndrew testified that the most accurate method of measuring value is by using the "comparable sales approach," which he employed in his appraisal of the subject property. Because of the scarcity of sales in the area resulting from the prevailing market conditions, he said that he was required to look beyond Watch Hill to find comparable sales that represented similar locational characteristics, physical attributes, and value. He used three "comparables" in his appraisal, one located in Jamestown, one in Newport, and one in the nearby Shelter Harbor neighborhood of Westerly. He said he believed that all of the properties were in very desirable locations, either near or on the water, and that their sale dates were close to the target appraisal date of December 31, 2009. After making adjustments to the sale values for different locations and amenities, McAndrew determined that the adjusted values of the properties ranged from $4.6 million to $5.1 million, and he concluded that the direct sales method indicated an estimated fair market value of $4.9 million for the subject property.

McAndrew also discussed several properties in the Watch Hill neighborhood that he decided not to use as comparables. The property at 7 Manatuck Avenue was assessed in 2009 at $6,498,200, following a sale of that property on April 18, 2008, for $6 million. He said he chose not to use that property as a comparable for the same reason that he would never use the Whittemores' purchase price as a comparable for other properties; because it was an aggressive price that could not be justified in the market. He explained that he had previously appraised 7 Manatuck Avenue in June 2007, before it was sold, for $4.4 million. Furthermore, the house at 7 Manatuck Avenue was completely rebuilt in September 2009 at a cost of $1.2 million, which, McAndrew testified, created a great deal of speculation about how much value was added by the improvements and reduced its usefulness as a comparable sale.

There were also three neighboring properties that had not been sold in the relevant time frame, and so McAndrew did not consider them as comparable sales. These properties were: (1) 15 Ocean View Highway, located just two houses away from 5 Manatuck Avenue; (2) 17 Ocean View Highway, immediately adjacent to plaintiffs' property and the property from which 5 Manatuck Avenue was subdivided in 2002; and (3) 8 Manatuck Avenue, located across the street. He noted that the assessment in each of those properties had been reduced in 2009 from its 2006 assessed values.[5] McAndrew believed the reductions resulted both from a reflection of the market downturn and because no improvements were made to the premises during that time. When asked how a review of those three properties affected his opinion of the value of 5 Manatuck Avenue, McAndrew testified, "[it] would tell you, as it's the charge of the assessor to be equitable, that using these neighboring properties, if the trend is down, then * * * the Whittemores' assessment * * * likely should have come down." McAndrew further testified that the increase in the assessed value in 2009 was solely attributed to the sale price because it was not attributed to any improvements after the purchase and was, therefore, "actually unprecedented anywhere."

### Stephen Ferreira's Testimony

Stephen Ferreira testified for defendant as an expert in mass appraisals and about his direct involvement in the 2009 townwide appraisal. Ferreira explained that the result of a mass appraisal was primarily derived from sales analysis; however, many other factors go into the ultimate assessment. Mass appraisals, he said, are unique because the process is designed to determine market value of all the property in a town using a consistent, standardized method in

---

[5] 15 Ocean View Highway was assessed in 2006 at $6,398,000 and reassessed in 2009 at $5,893,000. 17 Ocean View Highway was reduced in value between 2006 and 2009, from $5,336,200 to $4,920,900. 8 Manatuck Avenue was a large oceanfront lot with unobstructed views of the ocean and was assessed in 2006 at $8,774,500 and reduced in 2009 to $8,253,700.

an effort to establish equity across the tax base.[6]  Ferreira said that he had been involved in townwide appraisals in many municipalities throughout southern Rhode Island and that he believed the Watch Hill neighborhood to be a premier location in the state.

Ferreira explained that the value of each property is designated by employing several factors, including the size and character of the lot, the level of development and landscaping, the views, etc.[7]  The property received an adjustment of 9.99 for the character of the neighborhood because "[t]his is one of the highest neighborhoods in the Westerly program, and so that's giving a weight of essentially ten times the base price."  The building value was similarly calculated, using several factors such as the character of its exterior walls, the type of house, number of rooms, number of stories, age, condition, and other amenities.[8]

The process included a computer analysis of all the sales in Westerly to create a model of property values.  Ferreira explained, "[t]he model is derived from the sales, and it's done in a modeling format to ensure that whatever tables are set up can be applied across the [b]oard to the non-sale properties in a consistent way."  After statistical analyses are run on the sales, the model can identify "outliers," either sales where someone got a very good deal or where someone paid more than it was objectively worth.  Ferreira testified that outliers were not uncommon in high-

---

[6] Thompson, the current tax assessor, similarly testified that the goal of mass appraisals and fee appraisals is the same, but that the town had the additional obligation to be equitable across the tax base in mass appraisals.  Fee appraisals are individual appraisals conducted on behalf of a particular party such as a bank or an estate.

[7] The subject property was specifically designated as a single-family property, with the size of the lot calculated as 44,001 units, and a particular unit price of $3.05 for the size of the lot, which Ferreira explained was the same unit price assigned to every property of that size anywhere in town.  The property also received a value of 3.00 for the "C Factor," for condition, based on the property's views and other amenities.  In comparison, the oceanfront property across the street, 8 Manatuck Avenue, received a 4.50 for the C Factor because of its superior ocean views with no possibility of obstruction.

[8] Ferreira said that the values assigned for several factors would be multiplied together to reach a land value for 5 Manatuck Avenue of $4.8 million and a total building value of $1,082,100.

end markets because "people will buy homes and completely gut them and redo them to fit their own tastes because they have the finances and ability to do that."

He confirmed that the sale of 5 Manatuck Avenue for $7.1 million was such an outlier. However, the market in 2009 was difficult to model, he said, because another characteristic of high-end markets was that when the market crashes, as it did in 2008, properties are not put up for sale at the same rate as properties that are in lower value ranges. He said that there were fewer sales in the higher price ranges because people "had the ability to hold onto properties for extended periods of time" and wait until the market recovered. To make up for the insufficient sales data, the assessors had to look at other years, such as sales that occurred in 2008.

Ferreira agreed with McAndrew's assessment that the 2008 market experienced a 6 percent decline, saying, "I think that's a reasonable number in terms of what was going on in that time period." Yet, he did not apply a 6 percent reduction to everything "because each community is complex, it has different aspects. * * * They're all very different areas, and each one is changing differently based on the market."

### Charles Vacca's Testimony

Vacca testified that he was responsible for fixing assessments on all of the properties in Westerly and that the town had been required to conduct "revaluations" of all properties every three years since approximately 1998. The applicable statute required full revaluations in 2000 and 2009, involving the inspection and measurement of every property, and statistical updates in 2003 and 2006.[9]

---

[9] Vacca testified that full revaluations differ from statistical revaluations in that he would physically visit each property, measure and characterize the physical appearance, and try to go into as many properties as possible. Statistical revaluations relied nearly entirely on modeling sales and a mathematical approach to valuation.

Vacca testified that a sale is the best indication of property value and that he gives significant weight to sales data in doing assessments. Because the town does revaluations so frequently, Vacca's office tracked sales continuously, receiving each new deed to update the office records on ownership and sales values. He testified about the importance of obtaining information about sales:

> "It's incumbent upon an assessor's office to be aware of what transpired basically in every sale if you can possibly do that, and that's what we do. * * * [W]hen you get certain sales as we've talked about as being maybe outliers, we take a step further to find out, you know, what happened in this sale that we might be missing."

Vacca agreed with McAndrew and Ferreira that a particular problem arises with sales values in the high-end market because some people were willing to spend an exorbitant amount of money to get the exact house they desire. He said that, when a sale is for a vastly greater amount than sales of neighboring properties, it would be unjust to raise neighboring assessments in response to that sale. Vacca testified that, when he met with Mr. Whittemore in April 2010, he was aware that the $7.1 million sales price was extremely high and that an assessment reflecting that sales price would be unfair, but he did not recall investigating the reasons behind the high sale price. He said that his office "recognize[d] that there was activity on Manatuck that we felt as though that the values could be substantiated." He recalled making a slight reduction to the building portion of the assessment after meeting with Mr. Whitemore, but could not remember why he made that adjustment.

Vacca did not agree with McAndrew's approach of using properties that were beyond the Watch Hill area. He said that this was problematic because those properties could not be reliably used to determine value; he said that he never had looked outside of the Westerly area to assess properties in town. To compensate for the paucity of sales in the area around the time of the

2009 revaluation, Vacca said that he "looked at overall trends that took place, and we obviously looked at the two sales that we had on Manatuck, and we adjusted them." Vacca acknowledged that the sale of 7 Manatuck Avenue was an outlier, based on the fact that it sold for $6 million, substantially more than the $4.9 million assessment, and then the purchasers spent well over $1 million to rebuild the house. When asked why he gave the property at 8 Manatuck Avenue a lower assessment in 2009 than in 2006, Vacca responded that,

> "at that point in time I had no waterfront oceanfront sales in the town. * * * [I]n this business, you absolutely need sales to justify your assessment. * * * You still have to defend what you do in value, and we did reduce that; I did not have the sales to defend an $8.8 million sale."

Vacca then conceded that for each of the properties for which the town lacked comparable sales, his office reduced the assessment from 2006 by about 6 percent, based on a "general decline in the market."

When asked about the two appraisals obtained by Washington Trust, Vacca said that he did not see them until after the Whittemores initiated their appeals, but that he believed those appraisals supported his assessment. Each appraisal used comparable sales from late 2007 to early 2008, but, on cross-examination, Vacca acknowledged that it was not apparent whether the appraisers made any adjustments for the market downturn by October 2008, when the Washington Trust appraisals were conducted. Vacca noted that several of the sales used in the bank appraisals were problematic. 2 Overlook Drive in Westerly was used as a comparable in both appraisals. Vacca said, "[K]nowing what I know about 2 Overlook and the sale and the circumstances of the sale, I would never have used those in any appraisal." Vacca acknowledged that the use of that property as a comparable skewed the fair market value estimates of both appraisals upward.

- 11 -

**David Thompson's Testimony**

Finally, Thompson, the new assessor, testified as an expert in real estate appraisals. He testified that, although appraisers endeavored to obtain comparable properties with the closest sale date to the date of the appraisal, he considered the date of the sale to be less important than the location of the property. Therefore, he said, he would not have made use of the comparables used by McAndrew in appraising 5 Manatuck Avenue. He said that he did not believe there had been a downturn in the economy in early 2008, and that Mr. Whittemore's own testimony demonstrated that there was a competitive market for high-end homes at the time that he purchased the subject property. However, he conceded that there was a real decline in the market in the fall of 2008 that continued into 2009.

**The Trial Justice's Decision**

The trial justice issued a written decision in December 2013, granting judgment in favor of plaintiffs in all three appeals. In a comprehensive decision, the trial justice discussed the evidence presented in significant detail and noted "that each of the witnesses before the [c]ourt appeared to be credible, prepared, and well-spoken." In analyzing the evidence, however, the trial justice found Vacca's opinion as to the value of plaintiffs' property to be "arbitrary and erroneous." She concluded that plaintiffs had sustained their burden of proving that their property was overvalued by the tax assessor.

Based on the evidence submitted at trial, the trial justice found that the 2008 collapse of financial markets "stifled the national and state housing markets in general and the upscale Watch Hill market in particular." There was evidence of the decline in market values in the Watch Hill neighborhood from lowered assessments on the three homes in the immediate vicinity of the subject property. She noted that plaintiffs' assessment actually increased by 12.2

percent, "[i]n stark contrast" to those neighboring properties that, at the same time, had assessments decrease by an average of 7.1 percent.

Nevertheless, in determining plaintiffs' damages, the trial justice rejected the valuation offered by plaintiffs' expert of $4.9 million because she found "McAndrew's use of comparables outside Watch Hill [to be] questionable." She found that several of the expert witnesses, including McAndrew, testified to the unique amenities and luxuries found in Watch Hill, and that those amenities were not adequately accounted for by his choice of comparable sales. Even though she did not accept McAndrew's methodology, the trial justice nonetheless determined that both McAndrew and Vacca had testified credibly that the real estate market sustained a general annual decline of 6 percent. She found that "the appropriate measure of damages for this outlier is a 6% decrease from the previous assessed value." She further noted that his conclusion was "buttressed by the average rate of decline in assessments of nearby, albeit relatively superior, properties * * *." Therefore, the trial justice determined that the property should have been assessed at $4,945,246 on December 31, 2009, and that that value should have been carried over to the next two assessments for 2010 and 2011.[10]

With respect to plaintiffs' failure to timely file an account, the trial justice observed that it was undisputed that plaintiffs failed to comply with this requirement on a timely basis for any of the three tax years at issue. However, she declined to dismiss any of their petitions. For the 2009 assessment, she found that plaintiffs were not obligated to file an account because the assessed value had increased since the prior year's assessment. She found that the tax assessor waived his objection to the appeal of the 2010 assessment because he failed to raise the untimely

---

[10] She arrived at this value through the following computation: $5,260,900 – 315,654 (.06 x 5,260,900) = $4,945,246. She further concluded that plaintiffs were overassessed $959,754 annually and were entitled to damages to recover overpayments, with 12 percent statutory interest accruing as of the dates each of their quarterly payments was made.

- 13 -

filing as an affirmative defense. Finally, she determined that the tax assessor was estopped from raising that affirmative defense as to either the 2010 or 2011 petitions, because the forms provided to taxpayers claiming appeals did not conform to the statutory requirements contained in § 44-5-26(b). Specifically, the trial justice determined that the forms used by the Westerly tax assessor did not inform taxpayers of the necessity of filing a timely account and, thus, "lured the Whittemores into a false sense of security and, as a result, they failed to meet the March 15th deadline."

The defendant timely appealed each of the three cases.

**2**

**Issues on Appeal**

The defendant raises four charges of error that may be grouped for our purposes under two main issues on appeal. First, he contends that the trial justice erred by rejecting all expert assessments and appraisals and applying her own methodology in arriving at a value for the plaintiffs' property.

Second, defendant argues that the trial justice erred in refusing to dismiss plaintiffs' petition challenging their 2011 assessment because plaintiffs had actual notice of the deadline to file the required annual account.

**3**

**Standard of Review**

"We accord great deference to the findings of fact of a trial justice sitting without a jury, and will disturb such findings only when the justice misconceives or overlooks material evidence or otherwise is clearly wrong." Granoff Realty II, Limited Partnership v. Rossi, 823 A.2d 296, 298 (R.I. 2003) (citing Ferland Corp. v. Bouchard, 626 A.2d 210, 214 (R.I. 1993)). "[The]

resolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence, are entitled to the same deference." Wickes Asset Management, Inc. v. Dupuis, 679 A.2d 314, 317 (R.I. 1996) (quoting Warwick Musical Theatre, Inc. v. State, 525 A.2d 905, 909-10 (R.I. 1987)).

Our determination of whether the tax assessor utilized the requisite application form and whether the General Assembly provided a remedy for using the wrong language is a question of statutory construction. "Questions of statutory interpretation are reviewed de novo by this Court." GSM Industrial, Inc. v. Grinnell Fire Protection Systems Co., 47 A.3d 264, 267-68 (R.I. 2012) (quoting D'Amico v. Johnston Partners, 866 A.2d 1222, 1224 (R.I. 2005)). "[I]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Cummings v. Shorey, 761 A.2d 680, 684 (R.I. 2000) (quoting State v. Flores, 714 A.2d 581, 583 (R.I. 1998)). "In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature." GSM Industrial, Inc., 47 A.3d at 268 (quoting D'Amico, 866 A.2d 1224).

**4**

**Analysis**

**A**

**Fair Market Value**

The defendant first argues that plaintiffs were burdened with proving the fair market value of their property and, when the trial justice rejected their expert's appraisal, plaintiffs by necessity failed to satisy that burden. He maintains that, as a result of that failure, the trial justice should have ended her inquiry then and there and dismissed plaintiffs' appeals. The defendant

also argues that the trial justice misconceived the testimony offered by Vacca and Ferreira when she did not accept their comparable sales method and erred as a matter of law when she applied a 6 percent statewide annual depreciation rate to the value of the property.

The plaintiffs respond that defendant's arguments relate to the weight to be given to the evidence and not to any errors of law made by the trial justice. They argue that the trial justice was not required to accept the tax assessor's valuation, even after rejecting portions of McAndrew's testimony, and that she was free to consider all the evidence in the case, including evidence showing the decreased valuation of neighboring properties. They further argue that the tax assessor erroneously increased the value of their property in 2009 while decreasing the value of neighboring properties, and that the trial justice was justified in finding that the tax assessor acted arbitrarily.

### Defining Burden of Proof

"All real property subject to taxation shall be assessed at its full and fair cash value, or at a uniform percentage of its value, not to exceed one hundred percent (100%), to be determined by the assessors in each town or city * * *." Section 44-5-12(a). This Court has defined "full and fair cash value" as "that price the property would probably bring in a transaction in a fair market between a willing seller and a willing buyer." Cummings, 761 A.2d at 686 (quoting Rosen v. Restrepo, 119 R.I. 398, 400, 380 A.2d 960, 961 (1977) and Allen v. Bonded Municipal Corp., 62 R.I. 101, 105, 4 A.2d 249, 251 (1938)). "[T]ax assessors are entitled to a presumption that they have performed this official act properly." Granoff Realty II, Limited Partnership, 823 A.2d at 298 (citing Ferland Corp., 626 A.2d at 215).

In Nos Limited Partnership v. Booth, 654 A.2d 308, 310 (R.I. 1995), we outlined the appropriate procedure for challenging a tax assessment:

> "the assessor must first present his or her conclusion as to fair market value and the procedure used to arrive at such fair market value of the subject property. If the taxpayer challenges either the legality of the assessment or claims that the assessor used an inappropriate fair market value of the subject property, the burden will be on the taxpayer to present evidence of fair market value."

The defendant urges us to construe this language as establishing a burden on plaintiffs "to prove the fair market value of its own property," based on our decision in Harvard Pilgrim Health Care of New England, Inc. v. Gelati, 865 A.2d 1028, 1036 (R.I. 2004). There, we said that "Harvard Pilgrim's burden in this case required more than discrediting the city's depreciation scheme, or the admission by one of its witnesses that the formula did not reflect precise fair market value. The plaintiff also had to prove the fair market value of its own property." Id. The defendant essentially urges us to distinguish between "to prove" and "to present evidence of" and asserts that, when the trial justice rejected plaintiffs' expert's valuation, she effectively found that plaintiffs failed to meet their burden of proof.[11]

In Ferland Corp., 626 A.2d at 218, this Court held that the trial justice committed error when he accepted one expert's valuation but subsequently factored depreciation into that valuation after the expert expressly admonished the court against such a methodology. This Court rejected the trial justice's conclusion because it "fail[ed] to understand how the trial justice could have accepted [an expert]'s valuations and then disregarded his admonition regarding the addition of depreciation. The record is devoid of any evidence justifying this action." Id. Rather than declare that the plaintiff in Ferland Corp. had failed to meet his burden of proof, this Court's analysis focused on whether the specific facts and expert testimony supported the trial justice's ultimate valuation, not whether one expert's valuation was wholly accepted or rejected.

---

[11] We observe that the dispute in Harvard Pilgrim Health Care of New England, Inc. v. Gelati, 865 A.2d 1028, 1030 (R.I. 2004) concerned tangible property; however, the same statutory provisions govern the taxation of tangible and real property.

We decline to read the plaintiffs' burden quite as rigidly as defendant suggests. Black's Law Dictionary defines the word "prove" as "[t]o establish or make certain; to establish the truth of (a fact or hypothesis) by satisfactory evidence." Black's Law Dictionary 1420 (10th ed. 2014). It also explains that "[t]he burden of proof includes both the burden of persuasion and the burden of production." Id. at 236. It is well settled that "'a trier of fact can accept the property valuation of one set of experts and reject that of another set of experts.' * * * Just as a trial justice may pick and choose among evidence presented by laypersons, he or she may do the same when dealing with evidence of experts." Ferland Corp., 626 A.2d at 215-16 (quoting Kargman v. Jacobs, 122 R.I. 720, 735, 411 A.2d 1326, 1334 (1980) and Socony-Vacuum Oil Co. v. French, 88 R.I. 6, 11-12, 143 A.2d 318, 321 (1958)). Therefore, it is our opinion that the burden of proof on a plaintiff contesting a tax assessment requires that the plaintiff must produce evidence from which the trier of fact can sufficiently discern the fair market value. This evidence might include the testimony of the plaintiffs' own experts, testimony of the tax assessor, cross-examination of the town's experts, any other competent evidence entered into the record that assists the trier of fact, as well as the arguments made by counsel.

Thus, our task in this case is to: (1) review the trial justice's determination that plaintiffs met their burden of proving that the tax assessor's valuation was above the fair market value and (2) decide whether there was sufficient evidence to support the trial justice's valuation.

**Overcoming the Presumption of Correctness**

The defendant urges that the trial justice misconceived material evidence at several stages in her analysis. First, he claims that she misconceived the evidence when she found that Vacca and Ferreira testified that the subject property and its neighbor, 7 Manatuck Avenue, were "outliers" and should not have been considered in the assessment. Second, defendant argues that

- 18 -

the trial justice was clearly wrong when she declined to consider the two 2008 appraisals commissioned by Washington Trust Company, because those appraisals fully supported the town's assessment. Third, defendant argues that the trial justice misconceived the evidence when she found that the experts testified that "the real estate market sustained a general, annual decline of 6%."

In our view, defendant seeks to recharacterize much of Vacca's testimony, arguing that "both Ferreira and Vacca stated that they knew that [5 Manatuck] had been somewhat overpriced * * * and, consequently, they had adjusted its value downwardly." However, the record reveals that Vacca repeatedly confirmed that he believed the subject property's sale price was an "outlier," most notably in response to a direct question by the defense's counsel. Vacca was asked, "So [plaintiffs' counsel] talked to you a little about outliers and such, and you recognized, I think, as we stated prior, that 5 Manatuck Avenue, the purchase of that property was an outlier?" To which, he responded, "Yeah." He similarly acknowledged that the 7 Manatuck Avenue sale was an outlier because the purchasers paid 22 percent over the previously assessed value when they acquired the property before expending over $1.4 million to rebuild the existing house after the sale.

Most importantly, Vacca testified that he would not consider a sale price that he believed to be an outlier when assessing a neighboring property, but did not agree that it would be inappropriate to use that same outlier sale price when he assessed the property that had been sold at an excessive price. Thus, Vacca's testimony may fairly be characterized as somewhat contradictory on this issue. Vacca attempted to explain his approach to sales in the high-end market in this way:

> "Certainly in high-end real estate there's an awful lot of emotion, I
> have learned that over the years. * * * If somebody goes down to

an end of a road and buys one house for $1.8 million when I don't have an assessment on that street for 550, and this is a real story, there's no reason for me to look at that one sale and include that as a determining factor to say * * * that I should now raise everybody's assessment unless I know what happened in that sale. * * * [Y]ou're basically doing an injustice to everybody else on the street. So you have to look at a sale, you have to get a feel for where value is, and you have to approach it that way."

Despite that explication, however, Vacca did use the outlier sales values for 5 Manatuck Avenue and 7 Manatuck Avenue to justify raising the assessments on each of those properties. But he said that he did not have any comparative sales that would justify the prior assessments at 8 Manatuck Avenue, 15 Ocean View Highway, or 17 Ocean View Highway. He also insisted that location was the most important factor, and that 7 Manatuck Avenue and 5 Manatuck Avenue were adjacent to each of those three properties.

We conclude that the trial justice was well within her discretion when she found that the sales of 7 Manatuck Avenue and 5 Manatuck Avenue were outliers and in concluding that Vacca acted arbitrarily in assessing the Whittemores' property at $5.9 million. It is clear to us that Vacca considered both outlier sale prices when he arrived at the challenged assessment, even though he acknowledged that he did not use those sale prices to assess neighboring properties. Such a procedure was plainly arbitrary, particularly in the context of the mass appraisal revaluation that Ferreira testified was designed as a "standardized method to try to establish equity across the tax base." The natural consequence of that arbitrary methodology was to skew the assessment upwards. We hold that the trial justice was not clearly wrong when she determined that the resulting assessment was above the fair market value of the subject property.

Next, defendant assigns error to what he believes was the trial justice's finding that "all appraisals made on all properties prior to 2009 were unworthy of belief." The defendant gleans this blanket characterization from the trial justice's decision, wherein she wrote,

> "The [c]ourt infers from this testimony that prior to the Great Recession, appraisers lacked objectivity in completing an appraisal for a financial institution because they were provided the 'target number,' i.e., the sale price. For these reasons, this [c]ourt entirely disregards the usefulness of either of the October 2008 appraisals requested by Washington Trust, as Vacca should have done as well."

The plaintiffs argue that defendant's objection relates to the weight of the evidence relied upon by the trial justice and not to any misconceived or erroneous reliance on evidence in the record. We agree. It is clear to us that defendant overlooks the trial justice's other findings on the Washington Trust appraisals. The trial justice made the following findings:

> "The [Washington Trust] appraisals * * * relied on 7 Manatuck, as well as two other Watch Hill properties that sold * * * well before the market collapse in the fall of 2008. * * * One of the appraisals also relied upon a pending sale that ultimately sold for a drastically reduced sum than what was reported in the appraisal. * * * Vacca acknowledged the inaccuracy of these appraisals, noting that to the extent he relied on these appraisals, 'they were skewed upwards.'"

Based on our review of the record, we conclude that, even disregarding the trial justice's conclusion on the objectivity of appraisals commissioned by banking institutions, there was more than sufficient evidence to support the trial justice's rejection of the utility of those two appraisals in assessing the subject property's value. During an extensive cross-examination, defense counsel walked Vacca through the comparable sales, asking Vacca whether the appraisers hired by the bank made important adjustments for factors such as superior views or the timing of those sales. Vacca admitted that those adjustments were not made. After he testified to each of the comparables used, when Vacca was asked directly what he believed to be the best comparable sales for 5 Manatuck Avenue, the only property he could identify was the sale of the neighboring property at 7 Manatuck Avenue. Vacca's own rejection of the

- 21 -

comparable sales used in the two Washington Trust appraisals is persuasive evidence that those appraisals were unreliable.

Finally, we disagree with defendant's claim that the trial justice misconceived the evidence when she found that "the real estate market sustained a general, annual decline of 6%." McAndrew and Ferreira testified that there had been a general decline in real estate values by approximately 6 percent; and, contrary to defendant's assertion, both specifically testified that they believed the Watch Hill neighborhood experienced that same decline. Indeed, McAndrew testified that the decline in real estate values affected the high-end market the hardest, and that that market was the slowest to stabilize. Even if that evidence had been contradicted by other testimony, there can be no serious dispute that the trial justice is entitled to pick and choose between the testimonies of experts. Thus, she acted well within her discretion when she credited the testimony of Ferreira and McAndrew about the effect that the Great Recession had on market values in the Watch Hill neighborhood.

Indeed, that evidence was not contradicted. Importantly, the following exchange occurred between plaintiffs' counsel and Vacca:

> "Q:    Now, when we're talking about the assessments for 15 Ocean View and 17 Ocean View, which also dropped in their assessment during that period of time, correct me if I'm wrong, but I may be getting this wrong, there was at least a paucity of sales to justify carrying over the '06 assessments over to '09, is that a fair statement?
>
> "A:    When dealing with individual properties, unless we had something to really substantiate where value was, then we reduced the assessment, yes.
>
> "Q:    And you reduced the assessment based upon the general decline in the market, is that correct?
>
> "A:    We viewed it as a general decline, or what we interpret to be a general decline.

"Q:    Around 6 or 7 percent?

"A:    Yes, made it about 6 percent."

Thus, Vacca confirmed his belief not only that there had been a general decline in market values, but that the Watch Hill neighborhood in particular had been affected by a decline of 6 percent.

Therefore, we conclude that the trial justice did not misconceive the evidence presented at trial and that she acted well within her discretion to conclude that plaintiffs met their burden of proving that the tax assessor assessed the property at a value above the fair market value, overcoming the presumption that the tax assessor performed his duty properly.

**The Trial Justice's Methodology**

The final issue on fair market value, therefore, is whether the evidence supported the trial justice's determination of value.  The defendant argues that the trial justice erred as a matter of law because she fashioned her own methodology—what defendant dubs "the general market trend approach"—that he claims was neither supported by the testimony of the town's experts nor has ever been approved by this Court.  Effectively, defendant argues that the only method the experts testified about during this trial was the comparable sales method; therefore, the trial justice was obligated to apply it.  The plaintiffs argue that, once the trial justice determines that the tax assessor erred in his assessment, she was free to independently determine the value of the subject property, using any methodology that was supported by sufficient evidence on the record.

"This court has held on numerous occasions that comparable sales should be used in the valuation of real estate in the event that such comparable sales are available."  Ajootian v. Hazard, 488 A.2d 413, 416 (R.I. 1985) (citing  J.W.A. Realty, Inc. v. City of Cranston, 121 R.I. 374, 399 A.2d 479 (1979); Golden Gate Corp. v. Providence Redevelopment Agency, 106 R.I. 371, 260 A.2d 152 (1969); Manning v. Redevelopment Agency of Newport, 103 R.I. 371, 238

A.2d 378 (1968)). "Evidence of comparable sales is preferred because such figures provide the best evidence of fair market value." Sweet v. Town of West Warwick, 844 A.2d 94, 98 (R.I. 2004) (citing Corrado v. Providence Redevelopment Agency, 117 R.I. 647, 653, 370 A.2d 226, 229 (1977)). "'When evidence of comparable sales is not available or is inappropriate,' however, other methods of valuation may be employed." Id. (quoting Warwick Musical Theatre, 525 A.2d at 910). "'Significant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put.'" Id. (quoting Serzen v. Director of the Department of Environmental Management, 692 A.2d 671, 674 (R.I. 1997)). Indeed, in the context of eminent domain valuation, we have said that, "out of an overriding concern for awarding just compensation, the finder of fact may deviate from the comparable sales method of valuation when the evidence of comparable sales is 'no longer probative.'" Id. (quoting Corrado, 117 R.I. at 657, 370 A.2d at 231).

Each of the experts in this case testified about the paucity of useful comparable sales during the relevant time period. Further, McAndrew, Ferreira, and Vacca each testified to the unique challenges of trying to use comparative sales in the high-end estate-style housing market during an economic downturn, because those owners tended to have the financial means to hold on to property until the market improved. Furthermore, McAndrew and Vacca testified that, even when sales data was available, those sales in the high-end market tended to be less reliable in calculating fair market value because the purchasers could be driven by emotion, the prices could be the product of paying higher than market value for the perfect house, or even investing substantial money to build an entirely new house after the sale. Finally, McAndrew testified that the dramatic collapse of the housing market between 2008 and 2012 made the timing of a sale substantially more relevant to the usefulness of comparable sales.

- 24 -

Relying on the evidence before her, the trial justice rejected the comparable sales data considered by each of the experts and concluded that it was an error for Vacca to use the comparable sales approach in assessing plaintiffs' property. Vacca's own testimony indicates that he did not believe there were any reliable comparable sales for supporting the assessments at 8 Manatuck Avenue, 15 Ocean View Highway, and 17 Ocean View Highway, and that the only sale he considered comparable for the subject property was that of 7 Manatuck Avenue. Therefore, as this Court previously concluded in a similar case, "[w]e are of the opinion that the trial justice properly deviated from the comparable sales approach because the evidence before the court, as presented by both parties, was found to be unreliable and was, therefore, 'no longer probative.'" Sweet, 844 A.2d at 99 (quoting Corrado, 117 R.I. at 657, 370 A.2d at 231).

Here, unlike in Ferland Corp., 626 A.2d at 218, the trial justice benefitted from ample evidence that justified her decision to apply a 6 percent reduction to the 2008 assessment value. Each of the experts testified that a 6 percent general downturn in the market began in late 2008, and that evidence was believed to be specifically applicable to the Watch Hill neighborhood. The trial justice's decision, then, to conclude that the property should have been assessed at $4,945,246 on December 31, 2009, was an appropriate application of reducing the 2008 assessment of $5,260,900 by 6 percent.

Finally, we do not agree that the trial justice simply applied an across-the-board reduction method. Rather, the trial justice concluded that "Vacca's justification in assessing nearby properties at lower amounts based on the paucity of sales should have been applied to 5 Manatuck." When she decided that the appropriate measure of damages was to apply a 6 percent reduction to the 2006 assessment value, the trial justice was effectively applying the very method that Vacca had used himself to assess the neighboring Watch Hill properties—that the

comparable sales were unreliable and, therefore, "no longer probative," Sweet, 844 A.2d at 99 (quoting Corrado, 117 R.I. at 657, 370 A.2d at 231). Thus, it was appropriate to reduce the property's previous assessment in accordance with a market trend specific to that neighborhood. We conclude that the trial justice's methodology was, therefore, sufficiently supported by the record, and we shall not disturb it.

**B**

**Statutory Appeals Forms**

Next, defendant challenges the trial justice's refusal to dismiss plaintiffs' petition challenging their 2011 assessment, based on plaintiffs' failure to timely file an account, because she found that the forms provided by the town to taxpayers did not conform to statutory requirements set forth in § 44-5-26(b).[12] The defendant argues that the trial justice based her decision on one set of forms, but that she overlooked other forms, which did contain the required statutory language and, therefore, plaintiffs were cloaked with actual knowledge of the statutory requirements. The plaintiffs counter that the Legislature has mandated that all of the language in question be included on one appeal form, rather than spread throughout different forms, so taxpayers will not be surprised to discover that they have no right of access to the courts.

Section 44-5-26 provides that "[a]ny person aggrieved on any ground whatsoever by any assessment of taxes * * * may * * * file an appeal in the local office of tax assessment," the local tax board of review, and ultimately, the Superior Court. The right to appeal to the Superior Court is limited, however, by §§ 44-5-15 and 44-5-16. Section 44-5-15 requires that the tax assessor must publish notices informing the public that every person liable to taxation is required

---

[12] The defendant agrees that the petitions challenging the 2009 and 2010 assessments should not have been dismissed, and so only challenges the trial justice's decision not to dismiss the petition concerning the 2011 assessment.

to file with the assessors "a true and exact account of all the ratable estate owned or possessed by that person or body * * *." The provision further prescribes the following:

> "If any person * * * liable to taxation files with the assessors, on or before January 31 next following the date of assessment, a written notice of that person's * * * intention to bring in an account, the person * * * may bring in to the assessors the account <u>at any time between March 1 and March 15 next following the date of assessment</u>. * * * In case any person * * * <u>fails to file any intention</u>, that person * * * is <u>deemed to have waived that person's or that body's right to file the account</u>." <u>Id.</u> (emphases added).

Section 44-5-16(a) provides that the person providing the account must swear under oath that it is accurate and that any person who fails to bring in the account "shall have no remedy therefor, except as provided in §§ 44-4-14, 44-4-15, 44-5-26--44-5-31, and 44-9-19--44-9-24." Section 44-5-26(b) directs that appeals be on an application that "shall be in" a particular form, set forth in that provision, which contains explicit language of the limitations contained in §§ 44-5-15 and 44-5-16.[13] We repeatedly have explained that failure to file a sworn account by the statutorily

---

[13] The specific form required by § 44-5-26(b) includes in pertinent part the following provisions:

> "TAXPAYER INFORMATION ABOUT APPEAL PROCEDURE
> "REASONS FOR AN APPEAL. It is the intent of the general assembly to ensure that all taxpayers in Rhode Island are treated equitably. Ensuring that taxpayers are treated fairly begins where cities and towns meet defined standards related to performing property values. All properties should be assessed in a uniform manner, and properties of equal value should be assessed the same.
> "TO DISPUTE YOUR VALUATION OR ASSESSMENT OR CORRECT ANY OTHER BILLING PROBLEM OR ERROR THAT CAUSED YOUR TAX BILL TO BE HIGHER THAN IT SHOULD BE, YOU MUST APPEAL WITHIN NINETY (90) DAYS FROM THE DATE THE FIRST TAX PAYMENT IS DUE.
> "* * *
> "FILING AN ACCOUNT. Rhode Island General Laws [§] 44-5-15 requires the annual filing of a true and exact account of all ratable estate owned or possessed by every person and

prescribed deadline constitutes a failure to satisfy a condition precedent that allows the Superior Court to hear the merits of a tax appeal; however, failure to raise the unsatisfied condition precedent as an affirmative defense can result in waiver of that defense on appeal. See Narragansett Electric Co. v. Saccoccio, 43 A.3d 40, 44-45 (R.I. 2012); Granoff Realty II Limited Partnership v. Rossi, 833 A.2d 354, 358, 359 (R.I. 2003); Wickes Asset Management, 679 A.2d at 318; Rock Ridge Ltd. v. Assessor of Taxes, 667 A.2d 778, 780 (R.I. 1995).

In Rock Ridge Ltd., 667 A.2d at 780, we dismissed a taxpayer's argument that the tax assessor's published notice, pursuant to § 44-5-15, was deficient in not adequately apprising taxpayers of the consequences of their failure to file a sworn and timely account. We held that,

> "[t]here is no statutory requirement that the notice reveal the consequences of the failure to file an account. The respondent complied with the statute in issuing a notice that those liable for taxation are 'required to bring to the City Assessor a true and exact account of all ratable estate owned by him, or it * * *.' (Emphasis added.) The petitioner was on notice that the filing of an account was required. The ramifications of the failure to file an account are set forth in the taxing statutes and are not required to be set out in the notice. Section 44–5–16(a) provides that 'whoever neglects or refuses to bring in the account, if overtaxed, shall have no remedy therefore [save that afforded by § 44–5–26].' Given the case law and the provisions of the statute, it is our opinion that the trial justice properly granted respondent's motion for summary judgment." Rock Ridge Ltd., 667 A.2d at 780.

---

corporate body. The time to file is between December 31, and January 31, of intention to submit declaration by March 15. Failure to file a true and full account, within the prescribed time, eliminates the right to appeal to the [S]uperior [C]ourt, subject to the exceptions provided in Rhode Island General Laws [§] 44-5-26(b). No amended returns will be accepted after March 15th. Such notice of your intention must be sent by certified mail, postage prepaid, postmark no later than 12 o'clock midnight of the last day, January 31. No extensions beyond March 15th can be granted. The form for filing such account may be obtained from the city or town assessor."

However, it does not appear that we have addressed the particular issue of the tax assessor's duty to provide notice to taxpayers using the particular language of the taxpayers' obligation to file a sworn account under § 44-5-26. Since <u>Rock Ridge Ltd.</u> was decided, the General Assembly twice has amended § 44-5-26(b) in ways pertinent to this appeal: first, to include a specific form for the application to the tax assessor, specifying that the application be "substantially in the following form," <u>see</u> P.L. 1999, ch. 485, § 1; and second, to modify that same language that applications for appeals to the tax assessor "<u>shall</u> be in the following form," <u>see</u> P.L. 2001, ch. 365, § 1 (emphasis added). The required language includes a section specifically designed to apprise taxpayers of their rights and obligations in appealing a tax assessment and the consequences of not meeting those obligations.

The trial justice determined that those amendments created a mandatory obligation on the part of the tax assessor to provide the statutorily required language on all appeal forms, and that the failure to do so estopped the town from raising the affirmative defense that plaintiffs failed to file timely accountings. We are unconvinced by defendant's argument that the trial justice overlooked that he met his statutory obligations by providing the required language in different forms than the application for appeals. Plainly, that is not what the General Assembly contemplated in requiring that the application for appeals be included in a specified form.

Nevertheless, we are of the opinion that the tax assessor's obligation is directory, rather than mandatory. Although most prior cases addressing mandatory versus directory statutory language interpret time limitations, rather than content of notices, we have held on multiple occasions that apparently mandatory language is not necessarily mandatory where the language is directed at public officers or where the legislature does not provide a sanction for the failure to meet that requirement, so long as substantial rights of the parties are not prejudiced. <u>See</u>

Washington Highway Development, Inc. v. Bendick, 576 A.2d 115, 117 (R.I. 1990); GSM Industrial, Inc., 47 A.3d at 270; Town of Tiverton v. Fraternal Order of Police, Lodge # 23, 118 R.I. 160, 164-65, 372 A.2d 1273, 1275-76 (1977); Beauchesne v. David London & Co., 118 R.I. 651, 660, 375 A.2d 920, 924-25 (1977).

In New England Development, LLC v. Berg, 913 A.2d 363 (R.I. 2007), we reviewed our decisions in similar cases, noting that,

> "because the statute did not say that the failure to comply with the time constraints removed the director's jurisdiction to decide the matter, and because the statute contained no negative language in the event the director failed to act within the statutorily described period, we were constrained to find the statute directory as opposed to mandatory." Id. at 372 (quoting Bendick, 576 A.2d at 117).

In GSM Industrial, Inc., we held that language requiring that a notice of intention to enforce a mechanic's lien be executed under oath was mandatory and not directory because it was "expressed in clear, unequivocal, and mandatory language" and because the statute provided an explicit remedy that "unless all of its requirements are met, the lien 'shall be void and wholly lost.'" GSM Industrial, Inc., 47 A.3d at 270 (quoting Pezzuco Construction, Inc. v. Melrose Associates, L.P., 764 A.2d 174, 177 (R.I. 2001) and G.L. 1956 § 34-28-4(a)).

Here, the General Assembly did not provide any specific remedy for the town's failure to provide the specific language on application forms. The only explicit consequences provided in the statute—that "whoever neglects or refuses to bring in the account, if overtaxed, shall have no remedy therefor," § 44-5-16—are directed at taxpayers rather than assessors. We do not disagree with the trial justice's rationale that "the prerequisites to appeal a tax assessment reveal[] a complicated, cumbersome procedure with many pitfalls for unwary taxpayers." However, absent the provision of an explicit remedy accompanying the statutory directives, we cannot conclude

- 30 -

that the General Assembly intended for the town to be estopped from raising the affirmative defense.

Therefore, it is our opinion that the trial justice should have dismissed the plaintiffs' third petition challenging the 2011 tax assessment for failure to file a timely accounting with the tax assessor.

## Conclusion

For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Superior Court. We affirm the trial justice's determination that the assessments of the plaintiffs' home were excessive and incorrect with respect to the years 2009 and 2010, but we reverse the trial justice's decision as it pertains to the tax assessment for 2011. The record is remanded to the Superior Court for further proceedings consistent with this opinion.

**Justice Robinson, concurring.** I concur in the entirety of the Court's opinion in this case. However, I am troubled by the result reached with respect to the taxpayers' challenge to the 2011 assessment. I concede that existing Rhode Island precedent supports the Court's conclusion that the statutory requirement that particular language be included in the application form is directory rather than mandatory. While I consider it to be an exceedingly close question, I am persuaded that the fact that the General Assembly did not provide for any specific remedy for a municipality's failure to abide by the statutory requirement renders that requirement directory. However, I would hasten to add that the General Assembly's inclusion of a specific remedy would unquestionably lead me to conclude that we were confronted with a mandatory statutory provision; if such a situation were present in the instant case, I would have been of a different view concerning the 2011 assessment. See, e.g., GSM Industrial, Inc. v. Grinnell Fire

- 31 -

Protection Systems Co., 47 A.3d 264, 270 (R.I. 2012) (noting that the statutory requirement at issue provided that the penalty for noncompliance was that the lien in question would be "void and wholly lost") (quoting G.L. 1956 § 34-28-4(a)).



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:** Laurence F. Whittemore, III et al. v. David B. Thompson, in his capacity as Tax Assessor for the Town of Westerly.

**CASE NO:** No. 2014-157-Appeal.
(WC 11-252)
No. 2014-158-Appeal.
(WC 12-105)
No. 2014-160-Appeal.
(WC 13-152)

**COURT:** Supreme Court

**DATE OPINION FILED:** June 24, 2016

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:** Washington County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Kristin E. Rodgers

**ATTORNEYS ON APPEAL:**

For Plaintiffs: Kelly M. Fracassa, Esq.

For Defendant: Lauren E. Jones, Esq.
Robert S. Thurston, Esq.
Matthew T. Oliverio, Esq.